[Crim No. 21354. June 30, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN KING AINSWORTH, Defendant and Appellant.

990

992

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Supreme Court, and Steven W. Parnes, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp and George Deukmejian, Attorneys General, Steve White and Robert H. Philibosian, Chief Assistant Attorneys General,

Arnold O. Overoye, Assistant Attorney General, Joel Carey and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

PANELLI, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b))[1] from a judgment of death imposed under the 1977 death penalty law. (Former § 190 et seq., Stats. 1977, ch. 316, § 5 et seq., pp. 1256-1262.) Defendant was convicted of the first degree murder of Seng "Nancy" Huynh (§ 187) with findings that he was armed with and used a firearm (§§ 12022, subd. (a), 12022.5). Two special circumstance allegations were found to be true: that the murder was committed while defendant was engaged in the commission or attempted commission of (1) a robbery (former § 190.2, subd. (c)(3)(i)) and (2) a kidnapping (id., subd. (c)(3)(ii)). For reasons set forth hereafter, we affirm the judgment in its entirety.

### I. GUILT PHASE

#### A. BACKGROUND

Defendant and a codefendant, Donald Gene Bayles, were jointly charged with the murder of Ms. Huynh and with the two special circumstances—robbery and kidnapping.[2] For enhancement purposes it was further alleged that defendant and Bayles were armed with and used a firearm (§§ 12022, subd. (a), 12022.5) in the commission of the murder. Defendant was also charged with, and admitted, two prior robbery convictions.

Pretrial motions for change of venue by defendant and Bayles (§ 1033) were denied, as were pretrial motions for severance (§ 1098) by Bayles. Defendant's motions for severance, made during jury selection and on the first day of trial, were also denied.

At the conclusion of the prosecution's case-in-chief, defendant's motion for judgment of acquittal (§ 1118.1) on the special circumstance allegations was denied. The jury convicted defendant of first degree murder, found the special circumstance allegations true, and sentenced him to death. The jury

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was originally charged with a third special circumstance, rape—specifically, that the murder was willful, deliberate and premeditated and personally committed by the defendants during the commission or attempted commission of rape in violation of section 261 (former § 190.2, subd. (c)(3)(iii)). The allegation was dismissed on the district attorney's motion at the preliminary examination.

found codefendant Bayles guilty of murder in the second degree and found true the enhancement allegation that he had been armed with a firearm.

## B. FACTS

### 1. *Prosecution Case.*

Ms. Huynh was last seen alive on September 12, 1978, when she left her home about 3 p.m., driving her automobile, a green Hornet. She was on her way to work in downtown Sacramento. Ms. Huynh worked the evening shift, from 3:45 p.m. to 12 p.m. It was her usual practice to park her car in a lot near her place of work.

About 3 p.m. on September 12, 1978, witness Michael O'Brien was sitting in his car alongside the lot where Ms. Huynh usually parked. He noticed two men walk past his car, one on the left side of the car and the other on the right. He later identified the man who passed on the left as codefendant Bayles. After passing O'Brien's car, Bayles stood near the entrance to the parking lot for about five to ten seconds. Bayles shook his head as if he was in doubt about something and then entered the parking lot, leaving O'Brien's sight. The other man had walked to the parking lot entrance and instantly turned into the lot and disappeared from view. Although O'Brien was unable to identify the man who accompanied Bayles, O'Brien recalled that he was wearing a short-sleeved shirt. The man was about six feet tall, dark, and weighed about one hundred eighty pounds. He had a slight beard, perhaps a mustache, and fairly short, curly hair.

About a minute after Bayles left his sight, O'Brien heard a noise which he described as a "pop." About 30 seconds later, a green Hornet automobile came out of the lot. O'Brien saw three people in the car. Bayles was on the passenger side. In the middle was an Asian woman whom he identified as an "Oriental girl," sitting with her head down. The driver was the man who had earlier passed to the right of O'Brien's car. O'Brien saw the car make a right-hand turn going the wrong way on a one-way street, then turn around. The entire episode, from the time O'Brien first saw the two men until he lost sight of the car, lasted about two minutes.

Shortly after noon on the same day, the Department of Health, Division of Vital Statistics, located in downtown Sacramento, had received an unsigned application for a copy of defendant's birth certificate from a man who had come to the department counter. The certificate was to be mailed to defendant in Pacifica. The employee who waited on the customer could not identify defendant at trial as the person who handed her the application, although his face looked "familiar." As the jury was informed, defendant

refused to comply with a court order to provide a handwriting exemplar. His fingerprints, however, were found on the application.

Two days after Ms. Huynh's disappearance, on the morning of September 14, 1978, her car was found by police officers on Mori's Point in Pacifica. The car and the area around it were searched and processed for evidence. Bayles' fingerprints were found on two beer cans discovered in some bushes along the edge of the roadway, on the gas cap of the car, on the cellophane wrapper of an empty package of Camel cigarettes found beneath the driver's seat, and on a map in the glove box. Defendant's fingerprints were found on another map in the glove box and on a section of a newspaper found on the front seat of the vehicle. The newspaper was a copy of the Sacramento Bee, Blue Star Edition,[3] dated September 13, 1978.

An expended .45 caliber cartridge casing was found between the front seat cushions on the driver's side of the vehicle. On the floorboard beneath the driver's seat was a cash register receipt from a market in Hamilton City, California, dated September 13, 1978. On the floor beneath the rear seat of the vehicle was a folded and blood-stained napkin.[4] There were also blood-stains on the rear seat cushion and paper bags with blood on them in the trunk of the vehicle. Laboratory analyses indicated that the blood on the napkin, seat cushion, and paper bags was human blood which came from the same individual.

Henry Souza testified that he saw a green Hornet driven out onto Mori's Point about 6 p.m. the evening before the police found Ms. Huynh's car. Two Caucasian men were in the car and left within a few minutes after they arrived. The taller, huskier man was driving. Souza could not say whether defendant and Bayles were the two men he saw.

David Beverdge testified that in September 1978 he owned and operated the food market in Hamilton City which issued the September 13 receipt found in Ms. Huynh's car. Hamilton City is located about 11 miles east of Interstate 5 and is about a 2-hour drive north of Sacramento. Beverdge recalled that on September 13 he sold a six-pack of Budweiser beer to two Caucasian males, who also bought a newspaper. Although Beverdge could not recall what kind of paper the men bought, he recalled it cost 15 cents. Included among the 15-cent papers he sold at the time was the Blue Star Edition of the Sacramento Bee.

---

[3] The Blue Star Edition is a morning edition of the Sacramento Bee circulated outside the Sacramento metropolitan area.

[4] The victim's husband testified that the victim was menstruating on the day she disappeared.

Beverdge waited on the men for about two minutes. They both appeared to be in their early 20's. One of them was over six feet, taller and heavier than his companion. The taller man also had lighter hair than his companion, and it was he who purchased the beer and gave instructions. Beverdge saw no one else with the two men, and he did not notice the car they were driving. Beverdge could not identify either defendant.

On the morning of September 16, 1978, two days after the victim's car was found in Pacifica, Ms. Huynh's purse and bra were found on the ground at an interchange area off Interstate 5, about five and one-half miles north of the California-Oregon border. Among the items found in her purse were an empty 12-ounce Budweiser can, a lady's billfold, and a time card signed by the victim. Bayles' fingerprints were on the time card.

On January 20, 1979, nearly four months after her disappearance, Ms. Huynh's body was located in a wooded area approximately seven miles south of Elk Creek, California. The location was about a two-and-one-half-hour drive from Sacramento. Officers from the Sacramento Police Department and the Colusa County Sheriff's office were led to the scene by codefendant Bayles, who had been arrested the preceding day in Corning, California.

The victim's body was found in a clearing behind a log, covered by a 55-gallon drum. The body was in an advanced state of decomposition. The only clothing on the body was a blouse. A pair of slacks were lying across the victim's lower thighs and a pair of shoes was found two or three inches away. Near the victim's feet were a towel, pair of panties, sanitary napkin, box of facial tissues, and a match book.

Dr. Joseph Masters, a pathologist, conducted an examination of the body after it was returned to Sacramento. He discovered a .45 caliber copper-coated slug in the victim's right hip. A hole in the upper portion of the slacks found with the body was consistent with having been made by a .45 caliber bullet. The bullet had entered at the side of the left hip joint, passed through the pelvis, and came to rest on the outer surface of the right hip bone. The path was from left to right, slightly down to up, and very slightly front to back. Because the condition of the skin did not permit a determination of the presence of powder burns, Dr. Masters could make no findings as to the distance from which the shot was fired. The gun could have been right up against the victim when fired. Dr. Masters could not determine whether there had been any kind of injury or abuse to the body following the gunshot wound. He could not determine whether the only other injury identified, a bruise on the victim's left cheek, was caused before or after the shooting.

Dr. Masters determined that the cause of Ms. Huynh's death was a "bullet wound injury of the pelvis," but could not determine whether the victim had died within seconds or days of having sustained the injury, or at any point along this continuum.[5] Based on his examination, Dr. Masters concluded that the victim had been dead for more than a month but less than six months. The changes that were present could have occurred over a four-month period beginning September 12, 1978.

Dr. Masters did not do any tests for the presence of semen because he felt no tests were possible. Nor did he attempt to draw any blood samples for possible typing, because there was no blood present in the body. No blood or seminal fluid was identified on the slacks, panties or sanitary napkin; because of the deteriorated condition of the material examined, any traces of blood and/or seminal fluid that might have been present could easily have been putrefied and lost.

Dennis Ribble, an acquaintance and previous coworker, testified that he saw defendant at the latter's residence in Pacifica on September 10, 1978, two days before the victim's disappearance and six days before the police found the victim's car. Defendant's residence at the time was about a half-mile to a mile from Mori's Point, where the victim's car was found. About a week later, Ribble and his wife again saw defendant, who displayed a .45 caliber automatic handgun. Defendant stated that he had been to Sacramento with the weapon and indicated that he had had the gun when Ribble visited him in Pacifica on September 10th. When Ribble saw defendant on the 10th, defendant had "sort of" long hair and a mustache and, as was common for him, was a little unshaven. When Ribble saw defendant about a week later, defendant's hair and mustache were trimmed. Defendant indicated that he had made these changes in his appearance because he was "in trouble."

In the latter part of October, defendant sold a .45 automatic handgun to a coworker of Ribble's named S. C. Black. Defendant told Black he had to leave town and needed money to do it. Black received four live rounds of ammunition from defendant along with the gun. Black later fired these rounds, saved the shells, and gave them to Ribble who, in turn, delivered

---

[5] Dr. Masters testified that there are two major blood vessels in the pelvic region. These are the aorta, the major artery of the body, and the vena cava. If one of these major blood vessels was severed, the victim could have died in a matter of some seconds to minutes. The condition of the body precluded a determination as to whether major vessels had been severed. If none of the major vessels in the area was damaged, then the length of time a person with this type of injury might have survived would have depended on the extent of organ and tissue damage, the amount of hemorrhage, the degree of shock, and the rapidity of the development of infection caused by damage to the intestine or other organs. Assuming no medical treatment, someone with such an injury could have survived for days or longer.

the shells to the prosecuting attorney. Black also gave Ribble the gun he had bought from defendant. Ribble's wife gave the gun to the Pacifica Police Department.

Allan Gilmore, a criminalist, testified that the gun had a safety feature on the handle grip which, unless compressed, would prevent the gun from firing. This safety feature could be compressed by pushing the gun into someone's body. It took six pounds of pressure to pull the trigger. The gun could not be fired, however, unless the hammer was brought all the way back, which could only be done manually or by operating the slide.

Gilmore also examined and performed a number of tests on the .45 caliber slug removed from the victim's body, the .45 caliber cartridge case found between the front seat cushions of the victim's car, the .45 automatic handgun turned over by Mrs. Ribble to the Pacifica Police Department, and the .45 caliber cartridge cases turned over by Ribble to the prosecuting attorney. Gilmore's tests were inconclusive. He could not determine whether the fatal slug came from the cartridge case found in the car, nor whether the slug or the cartridge case had been fired from the .45 automatic handgun in evidence. Nor could he determine whether the cartridge cases turned over by Ribble and the cartridge case found in the car had been fired from the same handgun. Gilmore was only able to conclude that all of the cartridges may at some point have been "worked through" the same weapon.

In the latter part of September 1978, William Passe, at whose home in Pacifica defendant had been residing, received a letter from defendant dated September 19, 1978, and bearing a San Francisco postmark. In the letter, defendant stated that he needed the pink slip to his car, his clothes, and his fishing poles in order to get out of the state. The letter indicated that a birth certificate for defendant would be arriving in the mail.

On May 3, 1979, defendant was arrested in San Francisco. When arrested, he identified himself to the arresting officers as "Robert Ench" and stated to the woman he was with at the time: "That's it babe. This is sayonara."

On this state of the evidence, the prosecution rested.

2. *Defense Case.*

Defendant did not take the stand. Codefendant Bayles testified that he and defendant were the two men who drove out of the parking lot with Ms. Huynh on the afternoon of September 12, 1978. Bayles had met defendant that morning at a Sacramento bar. The two went together to another bar,

then walked near the Capitol to an office where defendant filled out some papers. Around 2 or 3 p.m., they approached the parking lot from which Ms. Huynh was abducted. They had had no conversation regarding stealing a car or robbing or kidnapping anyone; Bayles had not seen defendant with a gun. Defendant entered the parking lot first and said, "Come on, there's one over there." Bayles assumed that defendant, who was then out of Bayles' sight, was heading for another bar. Bayles then heard a "pop" or "phew" sound. He went through the parking lot and found defendant sitting inside a car, in the driver's seat, next to an Asian woman. Defendant said, "Come on, get in the car, we got us a ride." Bayles got into the passenger side of the front seat, thinking that the woman was going to provide them with transportation to another bar. The car initially traveled the wrong way on a one-way street.

The central theme of Bayles' defense was that the abduction and death of the victim, and the taking of her car, were entirely the responsibility of defendant and that Bayles accompanied defendant for fear of his own life. Approximately 30 minutes after leaving the parking lot, defendant told Bayles he had shot the victim. The three traveled north along back roads, using money from the victim's purse for beer and gas and stopping that evening for approximately 30 minutes to an hour at a rest area outside Yreka. They resumed their travel north, but Bayles could not recall anything about the seven or eight hours between leaving the rest area and arriving at the northernmost part of their trip. After Bayles, at defendant's direction, threw out the victim's purse and bra, they turned around and drove along back roads to Hamilton City, where they bought a six-pack of beer and a Sacramento Bee. At some point, Bayles urged defendant to take the victim to a doctor, but defendant refused. While driving from Hamilton City, about 24 hours after leaving the Sacramento parking lot, Bayles first noticed or assumed that the victim, who was then lying in the back seat of the car, was dead. Bayles and defendant disposed of the victim's body outside of Elk Creek. They then headed for the Bay Area, picking up a hitchhiker near the Golden Gate Bridge and dropping him off in downtown San Francisco. At defendant's suggestion, they then drove to Mori's Point, where they left the car. While at Mori's Point, Bayles broke away from defendant and spent the night in some high grass near a gas station. The next day Bayles made his way back home to Corning.

Most of defendant's defense witnesses sought to rebut the notion that defendant had been Bayles' companion, based primarily on the lack of a positive identification. In his closing statement to the jury, defense counsel argued that defendant's involvement was best explained by the possibility that he had been the hitchhiker picked up by Bayles and another man after the victim had been killed and her body abandoned.

3. *Verdict.*

The prosecution's theory was that Ms. Huynh's death was concurrently caused by her bullet-wound injury and the subsequent confinement barring access to medical care. Defendant's conduct was viewed as a single continuous course of conduct, with neither the shooting nor the confinement alone sufficient to cause death. The jury was instructed on two theories of first degree murder—premeditated murder and felony murder based on rape or robbery.

The jury found defendant guilty of murder in the first degree and found the robbery and kidnapping special circumstance allegations true as to him. The jury found codefendant Bayles guilty of murder in the second degree and found true the enhancement allegation that he had been armed with a firearm.

## C. GUILT PHASE ISSUES

1. *Change of Venue.*

Defendant contends the court erred in denying his motions for change of venue based on prejudicial pretrial publicity (§ 1033).

■ A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. (*People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240].) In considering the denial of a motion for change of venue the reviewing court must make an independent evaluation of five controlling factors: the gravity and nature of the offense, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused. (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574 [174 Cal.Rptr. 701, 629 P.2d 502].) When our review is posttrial, we must also examine the voir dire of prospective and actual jurors to determine if the pretrial publicity did in fact have a prejudicial effect. (*Harris, supra,* at 949.)

■ In this case the gravity and nature of the charged offense—capital murder—must weigh heavily in our determination. However, the extent and nature of the publicity appears "no different in degree or intensity than the usual reporting of other homicides of the kind involved here." (*Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 939 [187 Cal.Rptr. 455, 654 P.2d 225].) Defendant places particular emphasis on the similarities frequently depicted by the media between this case and the unsolved abduction and murder of one Eva Chu—an Asian woman and state employee who was

abducted from a downtown Sacramento parking lot during the middle of an afternoon in April 1979. Although the similarities between these two cases are indeed striking, we do not agree with defendant that the media association and, in one instance, confusion of the two cases were inherently inflammatory or constituted the "persistent linking" which defendant assails so as to affect the community's determination of defendant's guilt.[6] Only two prospective jurors confused the cases on voir dire, and they were both excused from the venire panels.

■ We also reject defendant's assertions that the media reporting of his codefendant's confession and of defendant's telephone call to his mother should be considered significant factors in determining whether the pretrial publicity was prejudicial. Although each of the four newspaper articles which stated that Bayles had made a confession also indicated that defendant was a suspect in the case, none indicated that Bayles had implicated defendant. (Cf. *People* v. *Tidwell* (1970) 3 Cal.3d 62, 65 [89 Cal.Rptr. 44, 473 P.2d 748].) Additionally, the single reporting of defendant's statement to his mother, though incriminating, did not constitute a confession (cf. *People* v. *Caldwell* (1980) 102 Cal.App.3d 461, 472-474 [162 Cal.Rptr. 397]) and did not explicitly implicate him in the murder of Ms. Huynh (cf. *Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872, 879-881 [101 Cal.Rptr. 411]).[7]

The smaller the community, the more likely a major crime will be embedded in the public consciousness. (*Martinez, supra,* 29 Cal.3d at 581.) In 1978, Sacramento County had a population of 738,500, ranking seventh in the state's 58 counties (Cal. Statistical Abstract (1979) table B-5, p. 11). These figures militate against a change of venue.

Defendant characterizes Sacramento as a "company town" of state employees and then seeks to elevate the victim's prominence in the community

---

[6] Defendant asks this court to conduct an in camera review of certain investigative materials from the Chu case, to determine whether the trial court properly denied his discovery motion. Defendant theorized that if someone else had confessed to murdering Ms. Chu, that person might have killed Ms. Huynh as well.

The material sought was privileged information regarding an ongoing criminal investigation. (Evid. Code, § 1040, subd. (b)(2).) The court reviewed the materials at an in camera hearing (Evid. Code, § 915, subd. (b)) and found ". . . no possible connection with or relation to the Defendant Ainsworth at all." Because of a possible resemblance between defendant and the person who confessed to the Chu killing, the defense was provided photographs of suspects in the Chu case, which were not used at trial. Under the circumstances, it appears the trial court properly denied discovery. (Cf. *Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 817 [112 Cal.Rptr. 257, 518 P.2d 1353, 95 A.L.R.3d 820].) We do not feel compelled to conduct our own in camera review.

[7] It was reported that he asked his mother "if she wanted to see him on death row when she advised him to give himself up."

by virtue of her state employment. (Cf. *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 289 [95 Cal.Rptr. 798, 486 P.2d 694].) Those prospective jurors who expressed particular feelings about the victim's status as a state employee were excused. Moreover, while the victim's status as a Cambodian refugee, the mother of a young son, and a reliable employee "undoubtedly engendered community sympathy" (*Martinez, supra,* 29 Cal.3d at 584), there is no indication that these factors resulted in "such pervasive civic involvement in the fate of [the] victim" (*Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 385 [66 Cal.Rptr. 724, 438 P.2d 372]) as to affect the fairness of the community's determination of defendant's guilt. (Cf. *Odle, supra,* 32 Cal.3d at pp. 940-941; *Maine, supra,* at 385.)

In considering defendant's status in the community, the press referred to defendant not as an outsider, but as a former resident of Sacramento County. (Cf. *Williams* v. *Superior Court* (1983) 34 Cal.3d 584, 594 [194 Cal.Rptr. 492, 668 P.2d 799].) He was not associated with an organization or group which aroused community hostility. (Cf. *Frazier, supra,* 5 Cal.3d at 290.) Rather, defendant appears to have been relatively anonymous in the community. (*People* v. *Jurado* (1981) 115 Cal.App.3d 470, 488 [171 Cal.Rptr. 509].)

Finally, we assess the voir dire of the prospective and actual jurors to determine if the pretrial publicity had any prejudicial effect. Defendant argues that all of the actual jurors had some knowledge of the case. ██ As this court has previously stated, however, "It is not required . . . that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-759, 81 S.Ct. 1639.)" (*Harris, supra,* 28 Cal.3d at 949-950.)

██ Defendant also argues that the trial court erroneously relied on the jurors' own assurances and self-appraisals of impartiality. Contrary to defendant's assertions, the nine jurors who indicated the extent or time frame of their recollection about pretrial publicity provided the court with an objective basis for its evaluation of their impartiality. The two jurors who did not indicate when, or to what extent, they had been exposed to such publicity did, however, indicate unequivocally that this exposure would not affect their impartiality and that they would base their decisions on the evidence presented at trial. Absent an assertion that voir dire was improperly limited, no more is required. (See, e.g., *Jurado, supra,* 115 Cal.App.3d at 491. Cf. *People* v. *Williams* (1981) 29 Cal.3d 392, 402-403 [174 Cal.Rptr. 317, 628 P.2d 869].)

Defendant also asserts that the voir dire of Juror Saldana warrants special scrutiny as she was unable to provide the assurance of impartiality expressed by the other jurors. Significantly, neither defendant challenged Ms. Saldana for cause nor exercised a peremptory challenge against her, even though none had been used, individually or jointly, at the time she was examined. (*Jurado, supra,* 115 Cal.App.3d at 491.) ▉ Moreover, where a prospective juror gives conflicting answers to questions relevant to her impartiality, as did Saldana, the trial court's determination as to her state of mind is binding upon the appellate court. (*People* v. *Fields* (1983) 35 Cal.3d 329, 355-356 [197 Cal.Rptr. 803, 673 P.2d 680].)

Our examination of the voir dire record shows that no juror had formed a pretrial opinion concerning defendant's guilt or innocence. It thus appears clear from the record that "the jury was not influenced by any of the pretrial publicity and that defendant was not deprived of a fair and impartial trial by reason thereof." (*People* v. *Salas* (1972) 7 Cal.3d 812, 819 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].)

Accordingly, we conclude that defendant's motions for change of venue were properly denied.

### 2. *Security Arrangements.*

Defendant contends that he was denied due process of law and a fair trial by excessive security arrangements without a showing of need for such arrangements. Insofar as defendant's claim is based on section 688, it is without merit, for that section applies only to physical restraints which, it is conceded, were not imposed in this case.

The number of armed, uniformed sheriff's deputies in the courtroom fluctuated between four and six. Defense counsel objected to the number and/or placement of the deputies several times during jury selection and once during trial. As far as the record shows, when six deputies were present, two were posted near the doorway. On one occasion, it was brought to the court's attention that while one deputy was positioned behind codefendant Bayles, two were posted behind defendant. The court noted, however, that the placement of the deputies was merely incidental to the configuration of the tables at which they sat.

▉ Unless armed guards are present in an unreasonable number, their presence need not be justified by the court or the prosecutor. (*People* v. *Duran* (1976) 16 Cal.3d 282, 291, fn. 8 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) Undoubtedly, more than the usual number of guards were present at pretrial proceedings and during trial in this case. However, the

court's remarks when overruling defendant's objections reflect the court's implicit decision that the presence of four to six uniformed guards was not unreasonable. From the limited record before us, it appears that the guards were strategically placed in the courtroom and were primarily concerned with security outside the courtroom. Given the nature of the charges, we cannot say that the trial court erred in concluding that the measures taken were not unreasonable. (See *Holbrook* v. *Flynn* (1986) 475 U.S. 560 [89 L.Ed.2d 525, 106 S.Ct. 1340]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 114-115 [241 Cal.Rptr. 594, 744 P.2d 1127].)

### 3. *Peremptory Challenges.*

Section 1070.5 prescribes the number and manner of exercising peremptory challenges by jointly tried defendants: "[W]hen two or more defendants are jointly tried for any public offense, whether felony or misdemeanor, the state and the defendants shall be entitled to the number of challenges prescribed by Section 1070, which challenges on the part of the defendants must be exercised jointly. Each defendant shall also be entitled to five additional challenges which may be exercised separately; the state shall also be entitled to additional challenges equal to the number of all the additional separate challenges allowed the defendants."

 Defendant contends that the trial court erred in requiring him to agree with codefendant Bayles in the exercise of joint peremptory challenges.[8] He asserts that the requirement of joint challenges creates a disparity between the prosecution and the defense which violates constitutional guaranties of due process and equal protection.

The requirement of agreement in the exercise of codefendants' joint peremptory challenges is supported by the plain language of the statute and all relevant authority. (See *People* v. *McCalla* (1857) 8 Cal. 301, 303; *People* v. *King* (1966) 240 Cal.App.2d 389, 398-402 [49 Cal.Rptr. 562, 21 A.L.R.3d 706]; *People* v. *Lara* (1967) 67 Cal.2d 365, 394-395 [62 Cal.Rptr. 586, 432 P.2d 202]; see also Witkin, Cal. Criminal Procedure (1963) Trial, § 405, p. 406; and Annot. (1968) 21 A.L.R.3d 725, 738-742, and cases cited therein.) Further, we have previously upheld section 1070.5 against due process and equal protection challenges. (See *People* v. *Miranda, supra,* 44 Cal.3d at

---

[8] On the first day of jury selection, defendant argued that sharing joint peremptories would deny him a fair trial, and he joined in Bayles' motion for severance, which was premised on the separate ground that trial with defendant was prejudicial to Bayles because of "divergent backgrounds, experience, and criminal records." The court denied the motion for severance, entertained a formal motion for additional individual challenges and denied it without prejudice. Thereafter, joined by Bayles, defendant objected on several occasions to the sharing of joint challenges and to the denial of additional individual challenges. All objections were overruled.

79-80; *People* v. *Lara, supra,* 67 Cal.2d at 394-395; see also *People* v. *King, supra,* 240 Cal.App.2d at 398-402.)

Neither the state nor federal Constitution "requires that Congress or the California Legislature grant peremptory challenges to the accused or prescribe any particular method of securing to an accused the right to exercise the peremptory challenges granted by the appropriate legislative body." (*People* v. *King, supra,* 240 Cal.App.2d at 399.) In *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], Justice Mosk reiterated that "the peremptory challenge is not a constitutional necessity but a statutory privilege" limited only, as stated in *King,* " 'by the necessity of having an impartial jury.' " (22 Cal.3d at 281, fn. 28.)

In *Stilson* v. *United States* (1919) 250 U.S. 583 [63 L.Ed. 1154, 40 P.2d 28], upholding a federal statute which required that the parties on each side be considered a single party for purpose of peremptory challenges, the high court stated: "There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges to defendants in criminal cases; trial by an impartial jury is all that is secured. . . . It may be, as is said to have been the fact in the trial of the present case, that all defendants may not wish to exercise the right of peremptory challenge as to the same person or persons and that some may wish to challenge those who are unobjectionable to others. But *this situation arises from the exercise of a privilege* granted by the legislative authority and does not invalidate the law. *The privilege must be taken with the limitations* placed upon the manner of its exercise." (250 U.S. at 587-588 [63 L.Ed. at 1156-1157]; italics in original.)

Defendant recognizes that all the authorities are contrary to his position but attempts to distinguish the instant case in that it involved a capital defendant with a hostile codefendant with whom he had a conflict of interest and with whom he was unable to cooperate in the exercise of some of the joint challenges. We find this argument unavailing.

Defendant and Bayles were allowed 26 joint challenges of which they exercised 20; Bayles exercised 3 of his 5 individual challenges, and defendant exercised all of his individual challenges. The voir dire exhausted two 60-person panels and part of a third; a total of 56 peremptory and 55 for cause challenges were exercised; jury selection took 13 days.

As noted, defendant attempts to distinguish this case from what appears to be well-established authority. Although defendant's characterization of the pretrial situation emphasizes "totally conflicting defenses" and "basic conflict of interests," it was a fact that each defendant was charged with a

capital offense and each pursued a defense of denial.[9] Indeed, conflict and adverse interests amongst codefendants is not unusual. They seldom have common interests: "Frequently, as in the instant case, one defendant attempts to show that he is less, or his codefendant more, blameworthy, in the hope of avoiding the death penalty." (*People* v. *Floyd* (1970) 1 Cal.3d 694, 720 [83 Cal.Rptr. 608, 464 P.2d 64].) Ironically, it is precisely at the time of jury selection that codefendants would seem to have a common interest, namely choosing a jury that is not "pro-prosecution."

Nor is this the first *capital* case where codefendants have had diverse and conflicting interests. In *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], remarkably similar to the instant case in that one defendant testified in his own defense by painting the other defendant as the villain, we stated: "As to conflicting defenses, counsel could articulate no reason for separate trials except to point out that the prosecution would simply put on its case, then sit back and watch as defense counsel became the real adversaries. Of course, if that point has merit, separate trials would appear to be mandatory in almost every case." (*Id.* at pp. 312-313.) While *Turner* concerned the propriety of consolidation for trial, *People* v. *King, supra,* 240 Cal.App.2d 389 is directly on point. *King* too was a capital case. There the stated reason for seeking additional peremptories was the adverse interests of the codefendants, as a result of which, it was urged, they were able to agree on only five of the joint challenges available at that time. (240 Cal.App.2d at 398-399.)

Finally, defendant asserts that only he was facing a potential death sentence. He points to a statement made by Bayles' counsel on the occasion of one refusal to agree with defendant in the exercise of a joint peremptory challenge. Bayles' counsel noted that he was "not particularly concerned about the death penalty." However, differing concerns among codefendants about the likelihood of a death verdict does not compel invalidation of

---

[9] Significantly, it was codefendant Bayles who moved to sever before trial and during jury selection, complaining that he would be prejudiced by a trial with defendant, who had an extensive criminal record. Defendant did not move for severance on grounds of conflicting defenses until the first day of trial when Bayles' counsel opted for an opening statement (§ 1093) during which he indicated that Bayles was an eyewitness to the crime and would take the stand. Concerned that the opening statement would reveal matters inadmissible against his client, defendant's counsel asked for limitations on the opening statement or for a separate trial. The trial court denied the motion to sever and granted the motion to limit the opening statement to testimony that would be given by Bayles.

Defendant's failure to move for severance before trial was clearly a tactical decision. He was aware from the time of arraignment that Bayles would attempt to shift the blame to him. Absent the testimony of Bayles, the evidence against defendant was entirely circumstantial. Undoubtedly, Bayles' testimony would be less prejudicial to defendant if it were presented as part of Bayles' defense rather than as part of the People's case-in-chief, a likely occurrence if Bayles' trial were severed and he pleaded and testified, as he requested.

section 1070.5. In *People* v. *Lara, supra,* 67 Cal.2d 365, we upheld the statute despite its inapplicability to one of the defendants, too young to be subject to that penalty. In *Lara* we found no statutory authority for additional challenges and also found no abuse of discretion in denying a motion to sever because of the limitations in section 1070.5.

In sum, we conclude that the trial court allocated the peremptory challenges in precisely the manner prescribed in section 1070.5. We are not persuaded that defendant's case is so unique as to compel reexamination of the well-settled law upholding the section against constitutional challenge and are further persuaded that defendant has not shown that he has been denied an impartial jury.

### 4. Unrepresentative Jury.

Defendant contends that the exclusion of prospective jurors because of their opposition to the death penalty denied him a representative jury. This contention has been rejected by us in a number of recent cases (*People* v. *Fields, supra,* 35 Cal.3d 329, 374, cert. den. (1984) 469 U.S. 892; *People* v. *Miranda, supra,* 44 Cal.3d 57, 78-79; *People* v. *Melton* (1988) 44 Cal.3d 713, 732 [244 Cal.Rptr. 867, 750 P.2d 741]) and by the United States Supreme Court in *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].

### 5. Evidentiary Issues.

#### (a) Bayles' Testimony Regarding Rape.

Defendant contends that, in admitting Bayles' testimony suggesting that defendant raped Ms. Huynh, the trial court failed to comply with Evidence Code section 352 which requires an express finding that the probative value of evidence sought to be introduced outweighs its potential prejudicial effect.[10] (*People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468].)

As noted, Bayles testified in his own defense. He was also cross-examined at length on the events of September 12 and 13, principally concerning the opportunities for escape and his failure to take advantage of them. On cross-examination, Bayles related that he threw the victim's purse

---

[10] The parties do not dispute the applicability of Evidence Code section 352 to exclude evidence proffered by a defendant as unduly prejudicial to a codefendant. The section is not limited by its terms to disputes by opposing parties; it may become applicable to parties on the same side of an action when their interests are adverse to each other. (*People* v. *Reeder* (1978) 82 Cal.App.3d 543 [147 Cal.Rptr. 275].)

from the car at defendant's command, but had no explanation of how the victim's bra got out of the car. Bayles was then asked if he knew how the victim's bra was removed in the first place.

Over objection by defendant's counsel, Bayles was permitted to testify that, at the rest stop near Yreka several hours before the purse and bra were discarded, defendant joined the victim in the back seat and said, "Okay, you bitch, now is it." Bayles further testified that he remained in the front seat, did not look to see what was going on in the back seat, and could not be sure that defendant was having intercourse with the victim. He did acknowledge, however, that he had told Detective Reese that Ms. Huynh had been raped by defendant, based on his subsequent observation that her pants and underpants were pulled halfway down. Bayles stated that he was trying to be alert to opportunities for escape, but was "afraid to look" in the back seat to see if defendant's pants were up or down.

When counsel was permitted to record his objections, he stated that the evidence related to uncharged crimes and was irrelevant and, even if relevant, the prejudicial effect substantially outweighed probative value. The trial court overruled the objections, noting that the testimony "has a bearing at least on the witness' credibility and that the jury may consider whether the witness did or did not have an opportunity to escape at that time, and having such an opportunity, whether he did or did not attempt it."

The Evidence Code section 352 objection was clearly before the court and, we assume, was considered in its ruling. Nevertheless, the court erred in failing to record that it did in fact weigh prejudice against probative value as required by *Green, supra,* 27 Cal.3d 1. (See also *People* v. *Frank* (1985) 38 Cal.3d 711, 731-732 [214 Cal.Rptr. 801, 700 P.2d 415].)

On this record, however, we conclude that the error was harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) While Bayles' testimony as to the act of rape was undoubtedly both probative and potentially prejudicial, it was not the only evidence before the jury which pointed to sexual abuse of the victim. There was other properly admitted evidence from which the jury could have inferred that the victim had been sexually assaulted. The jury was aware that the victim's bra had been found miles from her body and that the body when found was naked from the waist down. Further, the pathologist's inconclusive findings did not rule out the possibility that a rape occurred.

### (b) *Officer Lowe's Testimony Regarding Defendant's Extrajudicial Admission.*

 Called as a witness by codefendant Bayles, Officer Lowe of the Sacramento Sheriff's Department testified that on November 26, 1979, he heard defendant make the following admission while in a municipal court holding cell: "When I shot her she just squealed a little bit." Defendant contends that the trial court committed reversible error in admitting Lowe's testimony over his Evidence Code section 352 objection.

The prosecution had proposed to introduce Lowe's testimony during its case-in-chief. The court at that time rejected a defense argument as to relevance, ruling that the matters recited in support of the argument went to weight rather than admissibility. The court was concerned, however, with giving defendant the opportunity to contact as potential witnesses, those persons who had been in the holding cell with defendant.[11] When it appeared that the trial would be delayed by the search for the witnesses, the prosecutor withdrew his request to have Lowe's statement admitted.

Later, when Officer Lowe was called to the stand by codefendant Bayles, defendant again objected. First, counsel repeated his contention that the prosecution had deprived defendant of access to material witnesses, i.e., the other prisoners in the holding cell. Court and counsel engaged in extensive discussion on this point. Only thereafter did counsel secondarily refer to Evidence Code section 352: "I would submit that the probative value, especially if you don't have the person with whom Ainsworth was having the conversation before the Court, that the probative value is substantially outweighed by the danger of undue prejudice and would ask the Court to further exclude it on that ground." After additional discussion on counsel's unsuccessful efforts to find the witnesses, the court overruled the objection, explaining that everything that reasonably could be done had been done by the court and the prosecutor to afford counsel the opportunity to meet Lowe's testimony.

Defendant does not now question the court's ruling insofar as it is based on the witness-accessibility challenge. Rather, he complains that the trial court did not exercise its discretion under Evidence Code section 352, specifically that the record fails to reflect that the court engaged in the probative/prejudicial weighing process required by the statute and the rule of *Green, supra,* 27 Cal.3d 1.

---

[11] Defendant had complained that the prosecution had deprived him of access to material witnesses on the subject matter of Lowe's testimony, specifically that Lowe had failed to record the names of the persons in the cell with defendant at the time of his statement and had failed to mention the matter to the district attorney until two days after the incident.

As noted, none of the counsel argued the motion to the court. However, the probative value of the statement had been part of the argument on relevance, namely, that the nexus between the statement and the charged crime was questionable. Defendant's concern with its prejudicial effect, though never clearly articulated, was underscored by the extensive defense efforts to find witnesses who were in the cell with defendant. Thus, the probative/prejudice issue was before the court. The court, however, erred under the rule of *Green* in failing to articulate its reasoning or to record its implied finding in ruling on the motion. On the record, however, we find any error in this regard to be harmless.

Appellate counsel argues that the statement suggested a callousness on defendant's part that was likely to outrage the jury. In view of the evidence of defendant's callous and insensitive conduct vis-à-vis the victim in the 24 hours that followed the shooting, the evidence appears only cumulative. The court's failure to recite for the record its implied finding that probativeness outweighed prejudice did not result in a miscarriage of justice. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra,* 46 Cal.2d at 836.)

(c) *Bayles' Extrajudicial Statements.*

Bayles made two extrajudicial statements regarding his role in the murder, one, shortly after his arrest, to Detective Reese of the Sacramento Police and one to Dr. Captane Thompson during a psychiatric interview requested by the prosecution to determine whether Bayles had the capacity to form the requisite mental state for first degree murder.

We reject out of hand defendant's contention that, under *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], the trial court should have excluded those extrajudicial statements which implicated him. In the present case, where Bayles testified and was available for cross-examination, the admission of his extrajudicial statements implicating defendant did not infringe defendant's constitutional right to confrontation (*Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]) and did not constitute error under *Aranda*. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1118-1129 [240 Cal.Rptr. 585, 742 P.2d 1306].)

We nevertheless address, on general principles of evidence, defendant's challenges to the extrajudicial statements made by Bayles.

(1) *Bayles' Statements to Dr. Thompson.*

Dr. Captane Thompson, a psychiatrist, testified in Bayles' defense case as to Bayles' capacity to form the requisite mental states. Defendant contends

that Thompson's opinion testimony violated basic rules governing the scope and permissible subject matter of expert testimony. Specifically, it is urged that the testimony was little more than an opinion that Bayles was telling the truth—a matter not subject to expert opinion and within the province of the jury. The contention is largely unmeritorious.

Dr. Thompson based his testimony on discussions with two police investigators who described the crimes for which Bayles was arrested, Bayles' past history of arrests for public drunkenness, his assistance in locating the victim's body, and "his way of seeming to ingratiate himself and act in a way that seemed to want to please people and his rather passive style of relating to them." Dr. Thompson also relied on Bayles' statement regarding his involvement in the crimes, which was "fully consistent" with what Thompson had been told by law enforcement personnel. Over the hearsay objections of the prosecutor and counsel for defendant, Dr. Thompson testified to the entire content of Bayles' statement which, in the main, paralleled Bayles' testimony at trial.[12]

Based on this evidence, Dr. Thompson determined that Bayles was an immature and passive individual with a "childlike dependence on other people." While Bayles had a problem with alcoholism and was suffering "some impairment" as a result of "borderline intoxication" at the time of the victim's abduction, he did have the capacity to premeditate and deliberate. Dr. Thompson testified that he found no evidence that Bayles premeditated or deliberated the crimes in the instant case.[13] On cross-examination by the prosecution, Dr. Thompson stated he felt Bayles had been forthright

[12] Defendant's counsel was concerned about out-of-court statements allegedly made by defendant to Bayles: "At the very least I think I would be entitled to an admonition to the jury that this hearsay is not admitted against, it cannot be considered against Mr. Ainsworth." Upon request, a party is entitled to an instruction restricting evidence to its proper scope (Evid. Code, § 355). We find no reversible error, however. The jury had already heard Bayles' testimony and, insofar as there were inconsistencies between his testimony and what he told the doctor—and there were a few—they cast doubt on Bayles' credibility and redounded to the benefit of defendant.

[13] In responding to a question by Bayles' counsel whether he believed Bayles used his ability to premeditate and deliberate "at this particular time of this particular crime," Dr. Thompson replied: "I found no evidence that he had, at least from his description of what had happened, that he had in any way intended to, to do wrong in this whole episode. I don't believe that he planned or considered the alternatives or reflected on the consequences of his actions in any way. [¶] Rather I think in his childlike dependence on other people he simply seemed to go along and not know what to do once he found himself in water over his head." This opinion was again elicited on redirect examination: "Q. Doctor, back on January 22nd of this year, it was your opinion that you could find no evidence that Mr. Bayles maturely or meaningfully premeditated or deliberated in either the kidnapping or the shooting of the woman or that he harbored malice towards her; is that still your opinion? A. Yes."

in relating the events to him and was not feigning or trying to cover up anything.[14]

Opinion testimony by an expert witness must be based on matter "perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801, subd. (b).) An expert should be allowed to testify to all the facts upon which he bases his opinion, including relevant declarations to him. (*People v. Brown* (1958) 49 Cal.2d 577, 585 [320 P.2d 5].) The statements are admissible not as proof of the facts stated but to enable the expert to explain and the jury to appraise the basis of his opinion. (*Id.* at 586.)

Dr. Thompson's testimony was relevant to Bayles' defense of diminished capacity and Bayles' extrajudicial statement was clearly admissible as relevant to the development of Thompson's diagnosis of Bayles' mental state. The doctor's statement of his own belief that Bayles was not intentionally lying or deceiving him during the psychiatric interview was relevant to the reliability of the doctor's conclusions. As the People point out, the doctor did not testify that Bayles was in fact telling the truth or that his version of the events was more credible or worthy of belief than that of other witnesses. While this testimony of Thompson may have tended to enhance the credibility of Bayles' testimony, that was not the purpose of the psychiatric examination or of the doctor's testimony. Contrast the situation where a psychiatrist is called upon to assess a witness's *ability* to testify truthfully, as in cases where the credibility of a complaining witness is called into question. See, for example, *People v. Russel* (1968) 69 Cal.2d 187 [70 Cal.Rptr. 210, 443 P.2d 794] and *Ballard v. Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], cited by defendant in support of his challenge here. We agree that, in such cases, where the *sole* purpose of the psychiatric examination and testimony relates to the credibility of a witness, the psychiatrist may not testify to the ultimate question of whether the witness is telling the truth on a particular occasion. As defendant concedes, that was not the purpose of Thompson's testimony.

We do agree that the admission into evidence of Thompson's testimony that he "found no evidence that [Bayles] had . . . in any way intended . . . to do wrong in this whole episode" or that "he planned or considered the

---

[14] "Q. You indicated his initial attitude toward you . . . was quite cooperative? . . . A. . . . He was fully cooperative with me. He did not seem to be reserved or to be holding back any description of what happened as far as he could recall it. I had no sense that he was feigning or trying to cautiously cover up anything. I thought he was as direct and straightforward as he could be with his ability to describe what happened."

alternatives or reflects on the consequences of his actions in any way" was problematic. A psychiatric opinion that a person lacks the capacity to plan, consider alternatives, or reflect on consequences is of course considered to be within professional expertise, but having concluded that the examinee did have such capacity, we are dubious that an opinion as to whether the examinee in fact did those things is a matter within professional expertise. We are inclined to believe that the question, as phrased, was improper. However, even assuming that the doctor's response should have been disallowed, this testimony was only a small part of the lengthy testimony of Dr. Thompson and, in the main, his testimony was properly admitted. This small, short portion of the testimony cannot by itself be deemed prejudicial or warrant reversal.

(2) *Bayles' Statement to Detective Reese.*

 Detective Reese was called to testify in Bayles' defense. He related portions of a statement made to him by Bayles shortly after Bayles' arrest. Defendant contends that the trial court erred in admitting the statement. We conclude that, on this record, any error in permitting Reese to testify to statements made to him by Bayles was harmless.

The extrajudicial statement to Detective Reese had been mentioned initially during Bayles' direct examination when his counsel refreshed Bayles' recollection from a transcribed version. The prosecutor used portions of the extrajudicial statement to impeach Bayles (Evid. Code, §§ 770 and 780, subd. (h); § 1235) and, on redirect, over defendant's hearsay objection, Bayles' counsel sought to rehabilitate Bayles' credibility with testimony of several prior consistent statements he had made to Detective Reese. The court overruled the objection on Evidence Code section 791 grounds.[15]

Detective Reese was thereafter called to the stand by Bayles and related details of Bayles' statement to him. The prosecutor vigorously objected to the testimony of Reese as improperly admitted hearsay, noting that Reese was merely repeating Bayles' entire statement. Defendant joined in the objection.

Subdivision (a) of Evidence Code section 791 appears to have no application to the facts here; it only makes admissible evidence of a witness's prior

---

[15] Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

consistent statement which was made *before* the witness's alleged inconsistent statement. In the instant case, Bayles' testimony was impeached by prior inconsistent statements he had made to Reese. The prior consistent statements admitted to rehabilitate his credibility were made at the same time as the prior inconsistent statements. It is impossible to ascertain whether these prior consistent statements preceded the inconsistent statements, as we are not provided a transcript of Bayles' entire statement to Reese. Our analysis therefore focuses on subdivision (b).

Evidence Code section 791, subdivision (b) makes admissible evidence of a witness's prior consistent statements to rebut "[a]n express or implied charge . . . that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive." The party seeking to introduce a prior consistent statement must show that "the statement was made *before* the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Italics added.) That there may always have been present a motive to fabricate does not deprive a party of his right to show that another motive, suggested by the evidence, did not also affect his testimony. (*People* v. *Cannady* (1972) 8 Cal.3d 379, 388 [105 Cal.Rptr. 129, 503 P.2d 585].)

While defendant concedes that the cross-examination of Bayles by the prosecutor and counsel for defendant was intended to suggest that Bayles' testimony was fabricated and/or influenced by an improper motive, he argues that such motive arose during the four months between the crime and Bayles' arrest. Thus, the differences between Bayles' testimony and his statement to Reese merely evidenced "further refinements" of the same motive that prompted Bayles' extrajudicial statement, that is, to place the major blame on defendant. As such, defendant submits, Bayles' statement to Reese was not admissible as a prior consistent statement because it was not made before the improper testimonial motive arose.

The People, on the other hand, assert that, while Bayles may have fabricated his story prior to his arrest, a new or additional improper testimonial motive arose after Bayles' arrest and statement to Reese. The People argue that the thrust of the prosecution's cross-examination was to imply that "whatever story Bayles had earlier concocted," Bayles' trial testimony had been altered from his pretrial statements "to explain away various legal 'complications' unwittingly invoked by the extrajudicial versions, such as the felony-murder rule, the law of aiding and abetting, and the several factual inconsistencies between the earlier statements and a duress or lack of knowledge and intent defense."

The People's position is supported by the prosecutor's closing argument, which reveals an explicit charge that Bayles fabricated some of his trial

testimony after giving his statement to Reese, and an implied charge that Bayles' motive for fabrication was a recently acquired awareness and understanding of the legal nuances of the charges against him. The People's position is not, however, supported by the prosecutor's cross-examination, which was primarily directed at impeaching Bayles' credibility through the admission of his prior inconsistent statements to Reese. Since the critical time for determining the admissibility of a witness's prior consistent statements is when such statements are sought to be admitted, not at the closing argument, we are presented with the issue whether impeachment by evidence of prior inconsistent statements may be sufficient to constitute an implied charge of recent fabrication or improper testimonial motive for purposes of Evidence Code section 791. We believe the answer to that question is found in the following comment to that section: "[R]ecent cases indicate that the offering of a prior inconsistent statement necessarily is an implied charge that the witness had fabricated his testimony since the time the inconsistent statement was made . . . ." 7 Cal. Law Revision Com. Rep. (Dec. 1965) pp. 145-146, citing *People* v. *Bias* (1959) 170 Cal.App.2d 502 [339 P.2d 204].) While the Law Revision Commission made the comment with respect to subdivision (a), we conclude that it is equally applicable in interpreting subdivision (b).

Based on this minimal but persuasive authority, Bayles' entire pretrial statement to Reese, which was consistent with his trial testimony, whether testified to by Bayles or Reese, was properly admitted under Evidence Code section 791, subdivision (b) as relevant to rebutting the prosecution's implied charge of recent fabrication.

6. *Sufficiency of Evidence.*

Defendant contends that the evidence is insufficient to support the conviction of first degree murder based on the theories of premeditation and deliberation of rape-felony-murder[16] and that the judgment must be reversed because we cannot determine whether the jury based its verdict on those theories. (*People* v. *Green, supra,* 27 Cal.3d 1; *People* v. *Anderson* (1965) 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43].)

 Defendant concedes the evidence is sufficient to sustain a robbery-felony-murder verdict—"the evidence presented would have supported a finding that the firing of the shot was preceded or accompanied by an intent to rob." Moreover, we are able to determine from the record—specifically, the jury's finding of a robbery special circumstance—that the jurors agreed

---

[16] Although the rape special-circumstance allegation was dismissed at the preliminary examination (see *ante*, fn. 2), the trial court instructed on first degree murder predicated on a rape-felony-murder theory.

on that theory at least in reaching their verdict. We therefore uphold the first degree murder conviction on the theory of felony murder in perpetration of a robbery.[17]

Defendant contends, however, that we cannot uphold the conviction on any felony-murder theory because some of the jurors may have predicated their finding of felony murder on conduct subsequent to the shooting, i.e., deprivation of medical care, which conduct was insufficient to establish a proximate cause of death. The argument is specious. Whichever way the jury may have weighted the concurrent causes of death, no reasonable juror could have concluded on this record that the deprivation of medical care was a cause of death without first concluding that the shooting was a causal factor in the death of Ms. Huynh.

Under the felony-murder rule, "the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death . . . ." (*People* v. *Anderson* (1968) 70 Cal.2d 15, 34 [73 Cal.Rptr. 550, 447 P.2d 942].) First degree felony murder does not require proof of a strict causal relation between the felony and the homicide, and the homicide is committed in the perpetration of the felony if the killing and the felony are parts of one continuous transaction. (*People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Mason* (1960) 54 Cal.2d 164, 168-169 [4 Cal.Rptr. 841, 351 P.2d 1025].)

Here, the robbery and the actions causing death were part of one continuous transaction. The record points unerringly to a causal connection between the robbery and the death of the victim. It clearly shows that at least the intent to steal the victim's automobile was harbored both prior to and during the acts which resulted in the victim's death; the inference is clear that defendant harbored the requisite felonious intent to steal when he fired the shot that eventually killed the victim; this felonious intent continued for hours as defendant and Bayles fled north. There was ample evidence to support the jury's finding that the death occurred in the perpetration of the robbery.

7. *Instructional Error.*

Defendant assigns a number of instructional errors:

---

[17] We consider the question of the sufficiency of evidence of premeditation and deliberation at our discussion of the special circumstance issue. (See *post,* p. 1024)

(a) *Proximate Cause—CALJIC No. 8.55.*

Defendant urges that, if the evidence of proximate cause is sufficient, the trial court nevertheless erred in failing to instruct the jury that a finding of proximate cause requires proof that the conduct in question produced a significant decrease in the span of the victim's life. *People v. Phillips* (1966) 64 Cal.2d 574, 579 [51 Cal.Rptr. 225, 414 P.2d 353], which defendant cites as authority, is inapposite. In *Phillips,* a doctor was charged with homicide for convincing the parents of a young cancer victim not to have their daughter's cancer removed surgically. We held that the doctor's conduct was the proximate cause of death if it significantly shortened the victim's life span.

Here, there was no issue of intervening and/or superseding causes independent of defendant's conduct. Defendant shot Ms. Huyhn, which proved fatal because of his further conduct in confining her without medical aid. Since it was defendant's conduct which set in motion both concurrent causes of death, the *Phillips* case is inapposite.

The jury was given the standard instruction on proximate cause (CALJIC No. 8.55). While defendant could have requested the *Phillips,* or any other clarifying, instruction (*People v. Rogers* (1981) 124 Cal.App.3d 1071, 1080 [177 Cal.Rptr. 747]), the court was not compelled to give it sua sponte where, as here, it is clear that defendant's conduct significantly shortened the life of his 30-year-old victim.

(b) *Unanimous Agreement—CALJIC No. 17.01.*

The jury was instructed in the language of CALJIC No. 17.01 that "The defendant is charged with the offense of murder. He may be found guilty of that crime or any lesser included crime if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict." The instruction was inadequate, it is claimed, because it failed to inform the jury that it had to unanimously agree which conduct, the shooting or the barring of access to medical care, constituted the actus reus of murder and concurred with a mental state of sufficient culpability to support a first degree murder verdict.

The Attorney General concedes that the instruction was inappropriate in this case, where one offense has been charged and a continuing

course of conduct is shown to establish that single offense.[18] In the light of the evidence, however, the jury could not have been confused by the instruction. It was stressed throughout trial that concurrent causes contributed to the death—it was undisputed that the victim survived the initial shooting. This is not a case, therefore, with two distinct acts, each of which alone would have resulted in the victim's death. We find no prejudicial error.

### (c) *Elements of Robbery—CALJIC No. 9.10.*

■ Defendant contends that former CALJIC No. 9.10 (4th ed. 1979), defining the elements of robbery, did not adequately inform the jury that defendant's intent to permanently deprive the victim of her property had to coincide with the act of force or intimidation by which the taking of the property was accomplished. As a result, it is urged, we cannot determine from the record whether the jurors agreed on the conduct constituting robbery. Defendant relies on *People* v. *Green, supra,* 27 Cal.3d 1, 54, where we held that "the act of force or intimidation by which the taking is accomplished in robbery must be motivated by the intent to steal in order to satisfy the requirement of section 20: if the larcenous purpose does not arise until after the force has been used against the victim, there is no 'joint operation of act and intent' necessary to constitute robbery."[19]

On this record, we find that whether former CALJIC No. 9.10 complied with the rule we subsequently declared in *Green, supra,* 27 Cal.3d 1, is

---

[18]The use note on the instruction states: "This instruction designed for use only for violation of a statute under which any one of several different acts is sufficient to constitute the offense." (CALJIC No. 17.01 (4th ed. 1979).)

[19]Former CALJIC No. 9.10 (4th ed.) provided: "The crime of robbery is the taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.

"In order to prove the commission of the crime of robbery, each of the following elements must be proved:

"1. That a person had possession of property of some value however slight,

"2. That such property was taken from such person or from his immediate presence,

"3. That such property was taken against the will of such person,

"4. That the taking was accomplished either by force or violence or by fear or intimidation or by both, and

"5. That such property was taken with the specific intent permanently to deprive such person of the property."

CALJIC No. 9.10 was revised in 1982 to repeat the last element of the commission of the crime (subd. 5) in the definition of the crime itself. The first paragraph now reads: "The crime of robbery is the taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear and with the specific intent permanently to deprive such person of the property."

Section 20 provides: "To constitute crime there must be unity of act and intent. In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."

irrelevant because no reasonable juror could have concluded that defendant shot Ms. Huynh without a larcenous intent. The only reasonable inference that can be drawn from the evidence is that defendant randomly selected Ms. Huynh as a robbery victim and shot her to facilitate the taking of her car. It is irrelevant that some jurors may have found that defendant harbored a larcenous intent when taking the victim's money, purse, or bra, since those jurors must also have found that he harbored a larcenous intent at the time of the shooting.

Defendant also challenges the robbery instruction as it affects the felony-murder theory. It is suggested that the jury may have been confused as to when the robbery commenced which, in turn, may have resulted in lack of unanimity as to the conduct constituting robbery felony murder—that is, some jurors may have found felony murder based on the shooting and taking of the car, while others may have based this finding on the deprivation of medical care and the taking of the victim's money, purse, or bra.

As we have previously noted, the evidence is susceptible to only one conclusion regarding the commencement of the robbery—specifically, that the robbery commenced with the shooting and taking of the victim's car.

Accordingly, we conclude that the trial court adequately instructed the jury on the elements of robbery pursuant to CALJIC No. 9.10 and that there was no error in the robbery instruction as it affected the felony-murder theory.

### 8. *Rereading of Testimony to the Jury.*

Defendant contends that he was denied his constitutional right to be present at trial (Cal. Const., art. I, § 15) because he was absent when the court reporter reread testimony to the jury. He also contends that the omission of certain testimony requested by the jury constitutes reversible error. We reject both contentions.

During deliberations at the guilt phase, the jury requested the rereading of specific testimony.[20] The court summoned all parties and counsel and informed them of the jury's request. Counsel, and defendant and Bayles personally, expressly waived their presence during the rereading of the testimony in the jury room. The court denied defendant's request that Bayles' entire testimony be reread and instructed the reporter to identify the

---

[20] The foreman's note read: "We request the following testimony be read to us in the jury room, Dept. 10. That part of Mr. Bayles', particularly regarding period at parking lot. Further period from Yuba City to Oregon and return to restaurant at Yrecka [sic], California. Also testimony of Mr. O'Brien in full."

testimony requested by the jury, to read it to the jury on the following day, and to identify for the record those portions that were reread.

### (a) *Reread Testimony.*

Defendant first contends that the court violated section 1138 by the reporter's erroneous exclusion of several portions of Bayles' testimony which were crucial to defendant on specific issues and with respect to Bayles' overall credibility. Under section 1138,[21] the trial court must satisfy requests by the jury for the rereading of testimony. (*People* v. *Butler* (1975) 47 Cal.App.3d 273 [120 Cal.Rptr. 647].) Violation of section 1138 does not warrant reversal of a conviction, however, unless prejudice is shown. (*People* v. *Litteral* (1978) 79 Cal.App.3d 790, 797 [145 Cal.Rptr. 186].) Asserted error may be disregarded unless it is reasonably probable that a result more favorable to defendant would have occurred had the challenged portions of the testimony been reread. (*People* v. *Watson, supra,* 46 Cal.2d at 836.)

Defendant's claim of error centers on the failure to reread 28 pages of Bayles' cross-examination which fell within the portions requested by the jury. With regard to the issue of general credibility, of the approximately 72 pages of Bayles' testimony reread, 45 pages were cross-examination by either the prosecutor or defendant's counsel. The entire 28 pages of omitted cross-examination was by the prosecutor. A review of these 28 pages indicates that their omission would no more have assisted defendant in impugning Bayles' credibility than did the inclusion of the 45 pages. Moreover, any deleterious effect on Bayles' credibility would have been outweighed by prejudice to defendant. Thus, defendant complains that the 28 pages contained testimony by Bayles that he did not know what happened in the back seat of the car at the rest area and testimony that defendant failed to respond to Bayles' suggestion that they take the victim to a doctor. The omitted pages, however, also contained damaging evidence, namely, sexual assault testimony and repetition of Bayles' statement to Detective Reese that defendant vetoed the suggestion to seek medical care because defendant had been in prison.

What appears to have been at most a technical violation of section 1138 did not result in a miscarriage of justice and we therefore find the error harmless. (*People* v. *Watson, supra,* 46 Cal.2d at 836.)

---

[21] Section 1138, virtually unchanged since its enactment in 1872, provides as follows: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

(b) *Right to Presence.*

Defendant next contends that his absence from the rereading of testimony to the jurors violated his right to be personally present at his trial, as guaranteed by article I, section 15 of the California Constitution and implemented by statute in section 1043. His further contention—that waiver is not permitted in a capital case—is unsupported in statutory or decisional authority.

The issue of right to presence at the rereading of testimony in the jury room was before us in *People* v. *Bloyd* (1987) 43 Cal.3d 333 [233 Cal.Rptr. 368, 729 P.2d 802], a capital case. ▇▇▇▇ Referring to *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149] and *People* v. *Harris, supra,* 28 Cal.3d 935, also capital cases, we restated the rule that lack of defendant's presence becomes a denial of due process only when his presence will be useful or of benefit to him and his counsel and the burden is on defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. (43 Cal.3d at pp. 359, 360; see also *People* v. *Hovey* (1988) 44 Cal.3d 543 [244 Cal.Rptr. 121, 749 P.2d 776].)

The question of waiver aside, defendant does not demonstrate that his absence prejudiced his case or denied him a fair trial. He asserts that, had he been present, he could have pointed out some of the omissions by the court reporter. Inasmuch as we have concluded that the reporter's omissions were de minimis and nonprejudicial, we see no significance in defendant's absence from the rereading.

## C. SPECIAL CIRCUMSTANCE ISSUES

1. *Section 1118.1 Motion.*

At the close of the People's case-in-chief defendant moved for a "judgment of acquittal" of the two special circumstance allegations, pursuant to section 1118.1, on the ground that the evidence was insufficient to show defendant had premeditated and deliberated the killing of Ms. Huynh.[22]

---

[22] Section 1118.1 provides in pertinent part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

Neither the court nor the parties questioned the applicability of section 1118.1 to challenge the sufficiency of the evidence of a special circumstance, and the issue is not raised on this appeal. Significantly, however, decisional law has permitted the use of a pretrial section 995 motion, commonly used to set aside the indictment or information for lack of probable cause, to attack the sufficiency of evidence to support a special circumstance allegation. (*Ghent* v. *Su-*

The special circumstances with which defendant was charged required a finding under former section 190.2, subdivision (c)(3) that "[t]he defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death and . . . [t]he murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of . . . (i) [r]obbery . . . [and/or] (ii) [k]idnapping."

Defendant challenged the sufficiency of the evidence to show that the killing was "willful, deliberate, and premeditated." The test to be applied by the trial court under section 1118.1 is the same as that applied by an appellate court in reviewing a conviction—whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged. (*People* v. *Lines* (1975) 13 Cal.3d 500, 505 [119 Cal.Rptr. 225, 531 P.2d 793]. See also *People* v. *Blair* (1979) 25 Cal.3d 640, 666 [159 Cal.Rptr. 818, 602 P.2d 738]; *People* v. *Belton* (1979) 23 Cal.3d 516, 520-521 [153 Cal.Rptr. 195, 591 P.2d 485].) In short, the trial court must determine whether the prosecution has established a prima facie case. Here, the trial court determined that the prosecution in its case-in-chief presented sufficient evidence to warrant the submission of the special circumstance allegations to the jury. On review of the record, we agree.

Defendant does not dispute that the prosecution presented sufficient evidence in its case-in-chief to permit a jury to find (1) that defendant shot the victim in the hip as she was seated in her car in a parking lot in downtown Sacramento, (2) that he immediately drove the car out of the parking lot, with the victim seated next to him, (3) that the victim—or at least her body—remained in the car for many hours as defendant and Bayles drove north into Oregon and then back into California, and (4) that the victim's body was left, largely disrobed, in an isolated, wooded area, covered by a 55-gallon drum.

The prosecutor, in opposing defendant's section 1118.1 motion, argued two theories under which the evidence could support a finding of premeditated and deliberate murder. The first theory was that the act of shooting the victim in the hip was itself accompanied by the mental state essential to willful, deliberate and premeditated murder. The second theory posited a

---

*perior Court* (1979) 90 Cal.App.3d 944 [153 Cal.Rptr. 720].) We approved *Ghent* in *Ramos* v. *Superior Court* (1982) 32 Cal.3d 26 [184 Cal.Rptr. 622, 648 P.2d 589], and extended its reasoning to the dismissal of special circumstance allegations by a magistrate at a preliminary hearing pursuant to section 871. On this authority and in the absence of objection, we address the section 1118.1 issue.

second, concurrent cause of death—the confinement of the victim, barring her access to medical care.

■■ We need not address the first theory because we conclude that the evidence is sufficient to sustain a finding of premeditated and deliberate murder based on the theory that defendant knowingly and intentionally permitted the victim to bleed to death as he kept her captive during the lengthy car ride after the shooting. Although the pathologist was not able to say for certain when the victim had died from the bullet wound, his findings certainly did not rule out the possibility that the victim had lived for some period of time after being shot. Further, a number of evidentiary matters pointed to the conclusion that the victim did not die immediately from the gunshot wound to her hip but remained alive for some time during the car ride. First, the fact that the victim was seated upright between the two codefendants when they drove out of the parking lot supports the theory that she was alive at that time. Second, the fact that no blood was found on the front seat—where the victim was seated at that time—clearly makes it less likely that the gunshot had severed a major blood vessel and had brought about the victim's death within seconds or minutes of the shooting; rather, the absence of blood on the front seat and its presence in other areas of the car—the rear seat and the trunk—support the theory that the victim survived for some period of time during the trip. Third, the fact that the victim's bra and purse had been discarded from the car in Oregon could reasonably lead the jury to believe that the items were removed from the victim at that time, most probably in the course of a sexual assault. Finally, the fact that the victim's body was almost entirely disrobed when it was found by the police would provide an additional basis for the jury to draw an inference that the victim was sexually attacked during the course of the car trip. If the jury concluded, from the above evidence, that the victim had indeed survived for a substantial period of time during the car trip, it could also infer that, since defendant obviously knew of the victim's injury, he had—by continuing to keep her captive—knowingly and intentionally deprived her of access to medical care while she bled to death.[23]

It is true, of course, that the evidence set forth above was inconclusive on the question of when the victim actually died, and a jury might have determined that the prosecution had not proven beyond a reasonable doubt either that the victim had survived for some time or that defendant had

---

[23] Since the victim was shot in a parking lot in downtown Sacramento in the middle of a weekday afternoon, the jury could obviously find that the victim would have obtained medical care with the help of others if defendant had simply left her at the scene of the initial shooting. The jury could also find that thereafter, during the car ride, defendant and Bayles had an infinite number of opportunities to leave the victim in a location where she would have been discovered and received medical aid.

acted with the intent to bring about her death. But the question under section 1118.1 is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination. On the basis of the evidence presented in the case-in-chief at this trial, we conclude that a rational jury could find that defendant was guilty of premeditated and deliberate murder for knowingly and intentionally permitting the victim— whom he had seriously wounded—to bleed to death as he kept her confined during the kidnapping.

### 2. *Sufficiency of Evidence.*

 Defendant next contends that the evidentiary insufficiencies of the prosecution's case-in-chief remained at the close of the guilt phase trial, i.e., that the evidence did not provide a basis for any reasonable trier of fact to conclude beyond a reasonable doubt that the victim died as a result of a deliberate, premeditated murder, or indeed, as the result of any conduct intended to cause her death. The contention is patently without merit.

As previously discussed, the prosecution's evidence cleared the section 1118.1 hurdle. Thereafter, the jury had much more evidence than that presented during the People's case-in-chief to arrive at the conclusion that defendant was guilty of a deliberate and premeditated murder. Bayles testified at length to the events that occurred after the initial shooting, stating that the victim had remained alive for many hours after being shot, that defendant had engaged in some sexual activity with her during the ride north to Oregon, that the victim had repeatedly asked for help as she grew progressively weaker, and that defendant had ignored her pleas. Bayles also specifically testified that although he wanted to get help for the victim at the outset of the journey, defendant told him that he could not take her to a doctor because he—defendant—had just gotten out of prison for previous robbery convictions. On this record, we hold that the evidence is sufficient to support the jury's finding of premeditated and deliberate murder.

### 3. *Failure to Separately Charge Robbery and Kidnapping.*

The special circumstance allegations charged defendant with a premeditated and deliberate killing in the commission of a robbery and a kidnapping. Former section 190.4, subdivision (a) provided that ". . . Wherever a special circumstance requires proof of the commission . . . of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime." Defendant was never separately charged with robbery or kidnapping, and the jury made no separate finding of guilt as to those charges.

The holding in *People* v. *Velasquez* (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341] disposes of the issue. There, the failure to separately charge was "clearly not prejudicial since the information notified defendant that he must defend against the special circumstance of a premeditated killing committed during the commission of a robbery." (26 Cal.3d at 434, fn. 6.) Here too, defendant was adequately notified by the special circumstance allegations. Further, the jury was fully instructed on the requirement to separately decide and find each allegation true or untrue and was given detailed instructions on the elements of each special circumstance, including definitions of robbery and kidnapping.

### 4. *Instruction on Robbery Special Circumstance.*

Defendant contends that the jury was incorrectly instructed when it was told that the crime of robbery continues until the perpetrator reaches a place of temporary safety. (CALJIC No. 9.15.) Defendant notes that the felony-murder special circumstance, unlike the felony-murder rule, requires a killing "during the commission" of a specified felony (former § 190.2, subd. (c)(3)). The felony-murder rule, on the other hand, employs the phrase "in the perpetration of" and applies to homicides that occur during an escape or, as commonly stated, until the felon reaches "a place of temporary safety." (*People* v. *Salas, supra,* 7 Cal.3d 812, 820-824.) Defendant argues that, in the context of a robbery-felony-murder special circumstance, the "commission" of the robbery does not include the flight therefrom. The legislative intent in this regard is evidenced, defendant contends, in the subsequent 1978 initiative which states the felony-murder special circumstance follows: "The murder was committed while the defendant was engaged in . . . the commission of, attempted commission of, *or the immediate flight after committing* [the specified felony]." (§ 190.2, subd. (a)(17), italics added.) Inclusion of the "immediate flight" language in the present statute, he claims, indicates an intent to exclude such flight in the former statute.

We reject defendant's interpretation. First, such an interpretation ignores the directive of section 190.4 that proof of the commission of crime required by a special circumstance shall be according to "the *general law* applying to the trial and conviction of the crime." (§ 190.4, subd. (a), italics added.) Further, defendant's interpretation ignores the clear implication in *People* v. *Fields, supra,* 35 Cal.3d 329, also a capital case tried under the 1977 statute, that traditional rules of robbery and escape are applicable to special circumstance allegations. In *Fields* the defendant took money from a victim whom he had forcefully confined in his home; hours later defendant shot the victim as they rode in a car; he dumped her body in an alley near his home. We held that "hot flight" language of CALJIC No. 9.15 was unnecessary

and inappropriate to the facts in *Fields*, but that the reference could not have prejudiced defendant. Pertinent to the matter before us now, however, we also concluded that Fields' home was not a place of even temporary safety until the robbery victim was killed. As in *Fields*, we find no reversible error in the trial court's instruction to the jury on the general principles of law relating to the crime of robbery and its duration.

### 5. *Instruction on Kidnapping Special Circumstances.*

Defendant's final challenge is to the kidnapping special-circumstance allegation. Defendant contends that the trial court prejudicially erred in failing to instruct sua sponte that, to find the kidnapping special circumstance true, it must be proved that the murder was committed in order to carry out or advance the commission of the crime of kidnapping. Defendant relies on *People v. Green, supra,* 27 Cal.3d 1 and *People v. Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883], decided after defendant's trial.

*Green* and *Thompson* stand for the proposition that when the underlying felony is *merely incidental* to the murder, the murder cannot be said to constitute "a murder in the commission of" the felony and will not support a finding of felony-murder special circumstance. In both *Green* and *Thompson* we concluded that the evidence was not sufficient to sustain a robbery-felony-murder special circumstance—that the evidence was not sufficient to establish that the defendant had a felonious intent independent of his intent to kill.

Here, on the other hand, there was substantial evidence from which the jury could have found the robbery and the kidnapping were not merely "incidental" to the murder within the meaning of *Green* and *Thompson* and that defendant harbored an independent felonious purpose as to those crimes.

The trial court is required to instruct sua sponte only on general principles of law relevant to issues raised by the evidence (*People v. Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311]) and on particular defenses when a defendant appears to be relying on such defense and there is substantial evidence to support it (*People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913]). There is nothing in this record to indicate that a kidnapping occurred during the commission of a murder, rather than vice versa, and even now the defendant does not contend otherwise. The court was under no sua sponte duty to instruct concerning such a theory. (See *People v. Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803].)

## II. PENALTY PHASE

### A. FACTS

#### 1. *Prosecution Case.*

Defendant stipulated to two armed robbery convictions—on April 23, 1968, in Sacramento County and on October 26, 1972, in Yuba County. The prosecution also submitted evidence of two "other crimes," both robberies, as follows:

Jay Campagna, manager of a market in San Mateo, testified that on September 14, 1978, defendant robbed him of about $200 at gunpoint. Defendant had been a customer of the store.

Robert Holley testified that on April 29, 1979, he and defendant, whom he had known for about six months, were drinking beer in Holley's San Francisco apartment. When Holley got up to get a beer, he was struck from behind. As he fell to the floor, defendant attacked and tried to strangle him. He was knocked unconscious. When he awoke the next morning, his watch, wallet and other possessions were missing.

The only other prosecution witness at the penalty phase was Dennis Ribble, who had testified at the guilt phase. Ribble testified to the conversation he had had with defendant in the middle of September 1978 concerning the possible purchase of defendant's gun. Defendant stated that Ribble "would not want the gun because it was hot." Defendant told Ribble he had shot and killed a man during a liquor store robbery in Sacramento and had carried the man's body around in his car for three days.

#### 2. *Defense Case.*

Defendant's niece and sister testified to his character, as did Hazel Deacon, a former girlfriend. An employer, who had known defendant for approximately six months, also testified to his good work record.

Defendant's 16-year-old niece, Sherry, testified that she spent several weekends, even weeks, with defendant in San Francisco and had never seen him with a gun. The girl "felt very safe" with defendant on trips to the mountains or fishing. Defendant was very kind to animals and she had never seen him hurt anyone. He could paint and draw and helped Sherry with her art work.

Defendant's sister, Carol Ann, testified that she had never seen defendant hurt anyone, that he was of "very fair" intelligence and had finished high school and taken some college courses in San Francisco. She indicated that defendant was 35 years old, was married, and had a 3-month-old son. Their father had committed suicide 16 years earlier; their mother was still living.

Hazel Deacon testified that she had known defendant for eight years. They had lived together from May 1977 to April 1978, during which time defendant worked full time. She had never seen him brutalize anyone and had felt safe when with him. Ms. Deacon described an occasion when a young girl was hit by a car; defendant ran to her, held her, and directed the girl's brother to find their mother and sent someone else for help; he comforted the girl until the fire department arrived. On cross-examination, Ms. Deacon testified she saw defendant with a firearm sometime at the end of September or beginning of October 1978; he told her at that time that he was planning on robbing a bank but there were too many police around.

Colleen Yoho testified that she and her husband remodeled apartment buildings in San Francisco. She met defendant in October 1978 through her son. She employed defendant part-time, doing maintenance and carpentry work. He was a good worker and within two weeks was working full time. The Yohos came to know defendant as a tenant and friend and socialized with him and his wife. She never saw defendant with a gun nor engaged in any violent behavior, and she felt in no way threatened by him during the months she knew him.

## B. PENALTY PHASE ISSUES

### 1. *Motion for Leave to Voir Dire Jury.*

Defendant contends that the trial court committed reversible error in refusing to permit him to voir dire the sitting jury to determine whether there was "good cause" under former section 190.4, subdivision (c),[24] necessitating the impanelling of a new penalty phase jury. The contention has no merit.

At the completion of the guilt phase, defendant's counsel moved for the impanelment of a new jury pursuant to subdivision (c) of section 190.4. The

---

[24] Former section 190.4 provided in pertinent part: "(c) If the trier of fact which convicted the defendant of a crime for which he may be subjected to the death penalty was a jury, the same jury shall consider . . . the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes."

court asked for a showing of good cause. Counsel could point to no facts establishing good cause, other than speculation that the sitting jury, having found defendant guilty of the charges against him, could no longer be impartial. The court denied the motion, noting the absence of good cause. Counsel then requested the court to allow voir dire of the jury by both parties; the court could then determine if there was good cause. The trial court denied the request. The court did not err.

In *People* v. *Fields, supra,* 35 Cal.3d at 351-353, we reaffirmed the policy of favoring the single jury for the guilt and penalty phases of a capital trial. We have upheld the unitary jury concept in analogous settings involving guilt penalty and sanity determinations. (See *People* v. *Duncan* (1959) 51 Cal.2d 523, 529-530 [334 P.2d 858]; *People* v. *Wein* (1958) 50 Cal.2d 383, 408 [326 P.2d 457].) Further, in both *Duncan* and *Wein* we held that the trial court was not required to let the defendant reexamine the jurors for cause after trial in one of the bifurcated phases.

### 2. Request for Continuance.

Defendant contends that the trial court abused its discretion in denying his request for a continuance to prepare a defense to "other crimes" which the prosecution presented in aggravation. We disagree.

Prior to trial and pursuant to former section 190.3, the prosecution notified defense counsel of five "other crimes" it intended to present during the penalty phase as factors in aggravation. Listed were (1) the 1968 armed robbery conviction, (2) the 1972 armed robbery conviction, (3) a 1978 assault on a police officer, (4) the armed robbery committed in San Mateo in 1978, and (5) the assault and robbery in San Francisco in 1979.

Prior to the penalty trial, defendant made several motions pertaining to these matters. First, he sought to limit the prosecution's proof of the two convictions to only the *fact* of conviction on grounds the prosecution had provided notice only of the fact of the convictions. The trial court denied the request to limit because the prosecution had given notice that "evidence" of the listed incidents would be presented.

The court then considered defense counsel's need for time to prepare a response to the "other crimes" evidence. Discussion centered primarily on the first three incidents—the two convictions and the 1978 assault on a police officer—and after it was determined that the primary witnesses involved in all three incidents were available, the court tentatively agreed to grant a week's continuance. When defense counsel continued to argue for more time, the prosecutor suggested a compromise to avoid what it consid-

ered an "unconscionable" delay for the jury. The court accepted the suggested compromise: The prosecutor was limited to proving only the fact of the 1968 and 1972 convictions and was prohibited from offering anything pertaining to the third incident. The court then denied the request for continuance.

Defendant now argues that what he sought at trial was to limit the prosecution to introducing the fact of the 1968 and 1972 convictions, while himself retaining the option of going behind the convictions to the underlying facts. The trial court's ruling was consistent with defendant's initial request, and we find no abuse of discretion in denying a continuance. Nor do we find any prejudice to defendant from the court's ruling.

 The granting or denial of a motion for a continuance in the midst of trial rests in the sound discretion of the trial judge. (*People* v. *Laursen* (1972) 8 Cal.3d 192, 204 [104 Cal.Rptr. 425, 501 P.2d 1145].) Defendant argues that, had the continuance been granted, he would have been able to show that he was only tangentially involved in the armed robbery of 1968, waiting for the actual robber outside and running with him to a waiting car driven by a third person. Even assuming that its introduction would have mitigated the fact of the conviction itself, the jury would still have been informed of one unexplained armed robbery conviction and have heard the testimonies of the victim of a second armed robbery and of the victim of a robbery and assault. Each of these crimes was allegedly committed more recently than the 1968 robbery, suggesting that defendant had become progressively more violent, notwithstanding the apparently nonviolent nature of his initial participation in criminal activity. Additionally, as a result of the court's ruling, defendant was not required to defend against an alleged assault upon a police officer in 1978. Defendant was not prejudiced by inability to introduce evidence that he was only tangentially involved in the 1968 robbery.

3. *Instructional Error.*

(a) *Standard of Proof of "Other Crimes."*

 Defendant correctly assigns as error the court's failure to instruct that evidence of prior violent criminal acts could be considered in aggravation only if proved beyond a reasonable doubt. We so held in *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279]. We determine, however, that here the error was harmless.

The jury was instructed in the language of the statute, as set out in former CALJIC No. 8.88.1.[25] By stipulation of the parties, the court had also instructed that "for this phase of the proceeding there is no burden of proof on either side of the case."

In his argument to the jury, the prosecutor referred to the two robbery convictions and to the testimony of the victims in the two separate and unrelated robberies as examples of violent criminal activity comprising the life of the defendant. The prosecutor did not ask the jury to view each "other crime" as an aggravating factor, but to "total up that cart . . . as a factor in aggravation." Given that the prosecutor's reference included defendant's stipulation to two prior armed robbery convictions *not requiring the reasonable doubt instruction* and given that there was ample uncontradicted evidence that defendant committed the two additional robberies, we conclude that the failure to give a reasonable doubt instruction could not have affected the jury's consideration of the other crimes evidence. (See *People* v. *Miranda, supra,* 44 Cal.3d 57, 97-98.)

One final point regarding the "other crimes" evidence: We reject defendant's assertion that Ribble's testimony constitutes evidence of "other crimes" requiring proof beyond a reasonable doubt. Ribble testified that defendant told him he had shot and killed a man during a liquor store robbery in Sacramento and carried the body around in his car for three days. The prosecutor did not present the testimony as "other crimes" evidence; he referred to defendant's statements as only a thinly disguised reference to the instant crime,[26] and argued it as a part of the discussion on factor (a), the circumstances of the underlying crime and the special circumstances that had been found true.

(b) *Corpus Delicti Rule and Oral Admissions.*

Defendant contends that he was prejudiced by the court's failure to instruct sua sponte that the corpus delicti of a crime had to be proved

[25] "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable: . . . (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence . . . ." The 1977 statute, unlike the 1978 law, did not list as a separate factor criminal activity which had resulted in conviction.

[26] The prosecutor argued: "Even Steven King Ainsworth recognized the moral repulsion of his acts when bragging to Dennis Ribble about this crime he sought to disguise it by calling it a shooting of a man during a liquor store robbery, and he hung onto the body for about three days. You remember in a context of the guilt phase when that statement was made there was no question that Mr. Ainsworth was talking about the time he was in Sacramento in this particular area. Mr. Ainsworth could not himself stomach the horrible facts of what he did and had to disguise it before bragging to others about it."

independent of his alleged admissions and that evidence of oral admissions should be viewed with caution. The prosecution presented evidence of two extrajudicial oral admissions by defendant. The first was the statement allegedly made to Ribble. The second was the testimony of defense witness Deacon that, when she saw defendant with a firearm, "he said he was planning on robbing a bank, only there were too many police around." We conclude that neither admission required the instruction now urged by defendant.

Defendant's admission to Deacon did not relate to a crime for which there could exist the corpus delicti, and it was not characterized otherwise by the prosecution. The corpus delicti of defendant's admission to Ribble was established during the guilt trial. As noted above (see fn. 26), the admission constituted a reference to the instant offense.

### (c) *Dual Use of Underlying Crimes.*

 Defendant contends that the trial court erred in failing to sua sponte modify CALJIC No. 8.88.1 to make clear that factor (b) of section 190.3 applied only to "other crimes" and to preclude use of the circumstances of the underlying crimes under factors (a) *and* (b). It is well settled that factor (b) pertains only to criminal activity other than the crimes for which the defendant was convicted in the present proceeding. (*People* v. *Miranda, supra,* 44 Cal.3d at 105-106.)

On this record, however, the jury could not have been misled. The judge instructed, in the language of the statute, that the jury was to take into account and be guided by the enumerated factors. When discussing factor (b), the prosecutor stated: "This talks about the life of the defendant." When summarizing the other crimes and the testimony of Deacon, the prosecutor noted, in passing, that the life of crime was "punctuated by this case." The prosecutor did not suggest that the jury should consider "this case" in evaluating factor (b).

### (d) *Instruction on Character and Background as Mitigating Evidence.*

 Defendant contends that former CALJIC No. 8.88.1, factor (j) did not adequately inform the jurors that they could consider defendant's character and background in mitigation of the penalty. Factor (j), identical to factor (k) in the 1978 law considered in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], could in some situations unduly limit the jury's consideration of evidence relating to the general character,

family background, or other aspect of the defendant. On this record, however, the jury could not have been misled by the instruction on factor (j).

In his argument the prosecutor made it clear that the jury had to determine that the penalty of death was appropriate for *this defendant*. Before addressing the individual factors that were to guide them, the prosecutor told the jury they had to consider two issues, the first being whether the death penalty is proportionate to and appropriate for the circumstances of this crime. He continued, "The second issue, assuming you find it to be appropriate and proportionate to this crime, the second instance is, is it appropriate to this defendant?" Although the prosecutor did little more than describe factor (j) as the "catch-all factor," he did call attention to the testimony of defense witnesses at the penalty phase (". . . he's a good artist . . . nice to animals, and he doesn't commit crimes with his family looking"). Twice again the prosecutor told the jurors they had to determine that the death penalty was appropriate to the defendant, as well as to the circumstances of the crime. While the prosecutor stressed defendant's background of crime and minimized the mitigating evidence introduced by the defense, he did not at any time suggest that the jury could not consider any of the evidence that was presented to them. We conclude that the prosecutor's argument rendered harmless any deficiencies in the court's instructions. (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 786-787 [232 Cal.Rptr. 849, 729 P.2d 115].)

(e) *Standard/Burden of Proof.*

Defendant asserts that the jury should have been instructed that it could impose a sentence of death only if it found beyond a reasonable doubt that death was the appropriate penalty. We have previously rejected this claim. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779; *People* v. *Miranda, supra,* 44 Cal.3d at 69.)

(f) *Deletion of Inapplicable Mitigating Factors.*

Defendant faults the court for failing to delete from CALJIC No. 8.88.1 assertedly "inapplicable" mitigating factors. This claim of error has been rejected in *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].

4. *Prosecutorial Misconduct.*

Defendant complains that the prosecutor capitalized on the trial court's failure to delete mitigating factors by expressly arguing that the

absence of specific mitigating factors constituted aggravation. Although the prosecutor did not state that the mere absence of a mitigating factor itself constituted aggravation, he argued the evidence in such a manner as to contravene the spirit, if not the letter, of *People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861], upon which defendant relies. (See also *People* v. *Rodriguez, supra,* 42 Cal.3d at 789-790.) In essence, the prosecutor argued that certain otherwise mitigating factors should, on the facts of this case, be considered as aggravating.[27]

Although the prosecutor's argument, insofar as it characterized factors (c), (d), (f), and (h) as aggravating, contravenes *Davenport* and *Rodriguez,* his comments do not constitute prosecutorial misconduct requiring reversal of the judgment. A timely objection and admonition could have cured any harm. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.)

In any event, the prosecutor's comments could not have been prejudicial. The present case was tried before *Davenport, supra,* 41 Cal.3d 247, was decided. The 1978 law in effect at the time of *Davenport* directs that the jury impose the death penalty if the jury finds that aggravation *outweighs* mitigation. The 1977 statute did not contain mandatory language and that statute, applicable here, afforded the jury a greater latitude to exercise discretion in favor of a sentence of life imprisonment without possibility of parole. (*People* v. *Easley, supra,* 34 Cal.3d at 882.) Thus, the prosecutor's four-times-repeated reference to the word "aggravation" could not have had as significant an impact after instruction under the 1977 law as it might have had in an instruction under the 1978 law. This is especially so in view of the overwhelming "other crimes" evidence. The evidence of two armed robbery convictions and two additional violent robberies must have been crucial in the determination whether the death penalty was appropriate *for the de-*

---

[27] As to whether or not the defendant was under the influence of mental or emotional disturbance (§ 190.3, factor (c)), the prosecutor stated: "Was he crazy? Was he under a lot of pressure because of a job? Was he trying to feed his family? Is that why this type of crime was committed? Again, the answer absolutely not. This crime was committed because of a desire to steal, to kidnap, to rape and to kill. . . . It is a factor in aggravation." As to factor (d), whether or not the victim participated in or consented to the crime, the prosecutor told the jury: "It is hard to conceive of a more innocent victim than Nancy Huynh, who on September 12th, 1978, was just trying to lead her life . . . totally to her surprise she is snatched off the face of this earth, totally innocent victim. Again, absolute aggravation." As to whether or not the defendant was acting under duress or domination of another (factor (f)), the prosecutor commented: "There is no question who was in charge from the moment that car left the parking lot until it found its resting place on the cliffs above Pacifica. There is no question Mr. Ainsworth was not forced by anybody or anything to do anything except exercise his own free will. That aggravates the crime." And commenting on the factor of age (h), he noted that defendant was 33 or 34 at the time of the crime: "We're not dealing with an eighteen-year old, a nineteen year old who just doesn't know any better and for lack of maturity did a senseless act. We're dealing with a full grown adult here. Again, a factor in aggravation."

*fendant,* certainly more crucial than the fact that defendant was "not crazy," was "in charge," and was in his middle 30's. In sum, these considerations compel a conclusion that the prosecutor's comments could not have been prejudicial under any applicable standard.

### 5. *Constitutionality of 1977 Statute.*

Defendant contends that the 1977 death penalty statute in effect at the time he committed the offenses is invalid under both the federal and state Constitutions. He urges that the penalty of death is cruel and unusual punishment and the statute fails to provide enumerated safeguards. We have decided these issues adversely to defendant's position. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 184-186 [158 Cal.Rptr. 281, 599 P.2d 587]; *People* v. *Jackson, supra,* 28 Cal.3d at 315-317. See also *Pulley* v. *Harris* (1984) 465 U.S. 37, 51-53 [79 L.Ed.2d 29, 40-42, 104 S.Ct. 871].)

### 6. *Evidence Regarding Death Penalty.*

Defendant contends that the trial court erred in refusing to permit his defense counsel to read to the jury an account of an execution in the gas chamber. We decided the issue contrary to defendant in *People* v. *Harris, supra,* 28 Cal.3d 935, 962.)

### III. CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Mosk, J., Broussard, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied August 25, 1988.