Filed 5/2/13  P. v. Turner CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B234831 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA360333) |
| v. | |
| MATTHEW THOMAS TURNER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bob S. Bowers, Judge.  Affirmed.

Christopher A. Darden for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

Matthew Thomas Turner appeals the judgment entered following his conviction by jury of murder and attempted murder in which he personally discharged a firearm causing death or great bodily injury and acted for the benefit of a criminal street gang. (Pen. Code, §§ 187, subd. (a), 664, 12022.53, subd. (d), 186.22, subd. (b)(1)(C).) The jury also convicted Turner of possession of a firearm by a minor for the benefit of a criminal street gang. (Former Pen. Code, § 12101, subd. (a)(1); § 186.22, subd. (b)(1)(A).)[1]

Turner's first trial ended in a mistrial after the jury was unable to reach a verdict. Upon retrial, Turner was found guilty as charged. Turner retained new counsel and filed a motion for new trial. After conducting an extended evidentiary hearing, the trial court denied the motion. On appeal, Turner contends the trial court abused its discretion in admitting evidence of statements the surviving victim made to his friend at the hospital, the trial court erroneously denied the motion for new trial and defense counsel rendered ineffective assistance in numerous respects. We reject these contentions and affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

1. *The People's case in chief.*

    a. *The shooting*.

Shortly after noon on October 2, 2008, Joey Chavez and his girlfriend, Stephanie Renteria, both 17 years old, were walking on Avenue 58 in Highland Park with 16-year-old Adrian Betancor. Juan Velasquez, age 17 years, his girlfriend and their infant daughter were walking a short distance behind them with Renteria's sister and two nieces. Velasquez saw a suspicious brown vehicle, telephoned Chavez and warned him of its approach.[2]

---

[1]    Former Penal Code section 12101, subdivision (a)(1) was repealed and reenacted without substantive change as Penal Code section 29610. (See Stats. 2010, ch. 711 (S.B. 1080), § 6, operative Jan. 1, 2012.)

[2]    Velasquez and Chavez testified they are like brothers; Velasquez's mother is Chavez's legal guardian.

Chavez testified a white car reversed to where he was walking with Betancor and Renteria. Turner, the passenger in the white car, asked Chavez and Betancor where they were from. Chavez replied, "South Central Ghetto Boys," a gang that was not active in the area. Betancor said, "OCK." Turner responded, "Fuck OCK," then said "Avenues," and "started shooting" with a revolver. Renteria stood frozen in shock. Betancor and Chavez ran through a parking lot. Over the phone, Velasquez heard Chavez scream, "I got shot."

Betancor died of gunshot wounds suffered in the attack.

Chavez was shot in the arm, stomach, torso and shoulder. The bullet that struck him in the shoulder went through his cheek. Chavez was hospitalized for several weeks, underwent three operations and lost his right eye.

b. *Chavez's identification.*

A detective found Chavez bleeding from the right side and holding his eye. When asked who shot him, Chavez made the letter A, indicating an Avenues gang member. Chavez was shown photographs of suspects at the hospital but did not identify anyone.

On August 5, 2009, Chavez was unable to identify Turner in a live lineup.

Los Angeles Police Officer Jose Carrillo transported Chavez to the live lineup. Carrillo noticed Chavez "continued to track" Turner, who was Number 3 in the lineup. After Chavez completed a statement card, the detectives conducting the lineup indicated Chavez had failed to identify anyone. As Chavez and Carrillo walked to Carrillo's car, Carrillo asked if Chavez had recognized anyone. Chavez said he thought he recognized Number 3 "from that day." When Carrillo asked why Chavez did not write that statement on the form, Chavez said because Number 3 did not have a goatee. Carillo then asked why Chavez did not write that statement and Chavez said he did not understand the instructions. Chavez did not mention a mole.

At trial, Chavez testified he feared retaliation if he testified in this case and stated, "[A] lot of people might not like what I'm doing right now." Nonetheless, at the start of his testimony, Chavez identified Turner as the individual who shot him.

3

On cross-examination, Chavez indicated he was on a morphine drip in the hospital. He does not recall speaking with Velasquez at the hospital or telling the police the shooter had a goatee. The head injury and surgery have affected his memory considerably.

c. *Renteria's identification testimony.*

A police report dated October 6, 2008, indicated Renteria stated "the passenger looked like 'Fatal' but she wasn't sure." At trial, Renteria did not recall making this statement.

On October 31, 2008, Renteria described the shooter in a video tape recorded interview conducted by Los Angeles Police Detective Harold DiCroce as a dark-skinned Latino with a bald or shaved head. DiCroce asked Renteria if the shooter had any distinctive marks, such as a mole, a scar or a tattoo. Renteria did not mention the shooter had a mole on his face.

On November 19, 2008, Renteria worked with a police sketch artist to create a composite drawing of the shooter and was asked about distinguishing marks but failed to mention a mole. The artist testified she repeatedly asked Renteria if anything should be added to the image. Based on the absence of a mole in the final composite, the artist was confident Renteria did not mention a mole.

On June 29, 2009, Renteria selected Turner as the shooter from a photographic lineup shown to her by Detective DiCroce in a video tape recorded interview.

Detective Di Croce testified that, when Renteria viewed the photographic lineup, she initially said Turner looked "similar" to the shooter. In the subsequent interview, Renteria told DiCroce Turner looked "exactly" like the shooter and "so she wrote it." Renteria circled Turner's picture and wrote: "He has the same hair, dark like him and the mole stands out. Just by looking at him he has all the similar facial descriptions as the guy that I have seen. [Number] 4 looks exactly like him. Their facial descriptions are the same."

When DiCroce left the room with the signed photographic lineup, Renteria photographed the original photographic lineup, which had been left on the table in the

4

interview room, with her cell phone and placed the phone in her purse. DiCroce immediately returned to the interview room and seized Renteria's phone. Another detective verified the photograph had not been sent from the phone.

Renteria also identified Turner in position Number 3 at a live lineup on September 8, 2009. She testified she identified him because "he has the exact same mole and looks like the one that was at the scene." At trial, Renteria identified Turner as the passenger in the white car who shot Betancor and Chavez.

On cross-examination, defense counsel questioned Renteria about her identification of "Fatal" at the scene, and her failure to mention a mole when she was interviewed on October 31, even though the detective specifically asked if anything about the shooter's appearance stood out, such as a tattoo or a mole. Renteria testified her sister asked her to photograph the photographic lineup with her cell phone and she did so even though she knew she was not to discuss her identification with anyone. Renteria admitted that, when she attended the live lineup, she knew the suspect had a mole and she "went into the live lineup [with] a picture in [her] head."

   d. *Velasquez's testimony re Chavez's identification.*

Velasquez testified he was interviewed at the police station on the day of the shooting. He told the police Chavez would not identify a suspect for fear of retaliation. Later that day, Velasquez visited Chavez at the hospital. Chavez cried and turned away when Velasquez told Chavez that Betancor had died. The next day, Velasquez asked Chavez to identify the shooter and they argued about it for some time before Chavez indicated the shooter was "that guy we used to hang out with" in middle school, "the guy they call Snoopy or Snoop Dog." Chavez also said the individual who shot him had a mole on his face.

Outside the presence of the jury, Velasquez testified about an incident that occurred prior to the preliminary hearing in which Turner's father confronted Velasquez at a bus stop where Velasquez was seated with his girlfriend and daughter. Velasquez indicated he and Turner had been friends in middle school. Wayne Turner, Turner's father, exited a bus, confronted Velasquez and said, "You are the guy that said my son

5

kill[ed Betancor]. . . . I know who you are." Wayne Turner also stated Renteria and Chavez were liars and God would "make sure that we pay with our lives or something like that." Wayne Turner also sent messages to Velasquez via MySpace advising Velasquez to tell the truth. Velasquez indicated he was uncomfortable in court because Wayne Turner "sits there and stares at me." The trial court excluded Wayne Turner from the courtroom during Velasquez's testimony. Later in the proceedings, the trial court cautioned Wayne Turner about staring at people in the hallway.

e. *Alfredo Vilchis and Ernest Olguin.*

Alfredo Vilchis testified he saw the driver and passenger of a slow moving white car as he exited a tattoo shop on Avenue 58. Vilchis entered his SUV, which was parked in front of the shop, and waited for Ernest Olguin who was closing the shop. Olguin entered the SUV and Vilchis started to drive from the scene. As he did, Vilchis heard gunshots and saw the passenger in the white car shooting a gun. Vilchis identified someone other than Turner in a photographic lineup as resembling the shooter.

At a side bar conference during Vilchis's testimony, the prosecutor indicated Vilchis's whereabouts had been discovered about six weeks before trial. He was shown a photographic lineup in a videotape recorded interview but failed to identify Turner. However, after Vilchis saw Turner in court, Vilchis told the prosecutor he is "almost positive he recognizes this defendant."

Thereafter, when asked if he recognized anyone in court, Vilchis responded, "I kind of do, but the haircut just looks different." Vilchis indicated Turner, the passenger in the white car, had short hair on the day of the shooting. When asked how he recognized Turner, Vilchis testified that, when he entered the courtroom, "his face came back."

Vilchis was ordered to return the next morning. However, he failed to do so. When Vilchis reappeared, he told the trial court he did not return because, after he testified, four male Hispanics in their late teens with shaved heads had been seen in a car in front of the address on Vilchis's driver's license.

6

In the presence of the jury, Vilchis testified he returned to court after his first day of testimony but left when "two individuals in the hallway were mumbling shit to me."[3]

Ernest Olguin testified he got a better look at the passenger in the white car but turned away when the occupants of the white car looked in his direction. Shortly after the white car started to move in reverse, Olguin heard gunshots.

f. *Turner's gang membership and moniker.*

On two occasions before the shooting, December 5, 2007 and October 13, 2008, and on two occasions after the shooting, November 19 and 20, 2008, Turner told police officers he was an Avenues gang member and his moniker was Snoopy. On November 19, 2008, Turner's head was shaved and he was in baggy pants and a white T-shirt. On November 20, 2008, Turner said he had been a member of Avenues for two years.

2. *Defense evidence.*

At 1:01 p.m. on October 2, 2008, Turner reported to his probation officer on Eastlake Boulevard.

James Shaw, a professor of psychology and a court certified gang expert, testified an individual might identify with a gang without participating in its activities. Shaw opined no evidence indicated Turner was an active gang member.

Robert Shomer, an eyewitness identification expert, testified eyewitness identifications by strangers are about as accurate as a coin flip and life threatening stress reduces the likelihood of an accurate identification. The most accurate identifications are made in initial descriptions, where details are very important. Regarding the live lineup, Shomer testified, "If you go into a test and one of the alternatives looks familiar because you have seen him in a prior test . . . . you certainly do not have a valid reliable test of the ability of the witness to pick out somebody in a fair test."

Turner's neighbor testified he had never seen Turner with a goatee.

---

[3]     The trial court admonished the jury this had nothing to do with Turner.

7

3. *People's rebuttal evidence.*

A detective drove at lunchtime from the area of the shooting to the office of Turner's probation officer on Eastlake Boulevard in approximately 10 minutes.

4. *Defense argument.*

Defense counsel argued there was no credible evidence of guilt. Renteria gave generic descriptions of the shooter and never mentioned Turner's mole, even though she was asked by DiCroce and the sketch artist about such features. However, when shown a photographic lineup nine months after the shooting, she recognized Turner because of the mole. She changed her written statement on the photographic lineup statement card from similar to exactly after she spoke to Detective DiCroce and she took a picture of the photographic lineup with her cell phone to show her sister or someone else. Counsel argued Renteria identified Turner at the lineup because she had seen his picture in the photographic lineup. Also, Chavez consistently spoke of the shooter as having a goatee. However, Turner has never had a goatee. Counsel asserted Vilchis was not credible because he disappeared for two years after the shooting and failed to identify Turner in a photographic lineup. Also, Vilchis identified Turner in court, which is a suggestive setting, and the identification was made after a break during which Vilchis spoke to a detective. Further, when it was time for cross-examination, Vilchis disappeared.

5. *Motion for new trial.*

After he was convicted, Turner retained new counsel who filed a motion for new trial alleging ineffective assistance of trial counsel and the prosecution's failure to disclose exculpatory evidence. (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215].) The trial court conducted a hearing on the motion at which numerous witnesses testified. One of the issues investigated at the hearing was the allegation defense counsel failed to recall Olguin to the stand after learning he told Detective Lisa Governo, upon seeing Turner enter the courtroom, "that's the wrong guy."

8

The record indicates Olguin evaded service of process in this case. A warrant for his arrest issued on March 30, 2010. He was arrested on the warrant on June 22, 2010, but was released on an electronic monitor after it appeared he was in danger in custody.[4] At the conclusion of Olguin's testimony on August 3, 2010, the trial court ordered the electronic monitor removed.

Regarding Olguin's statement to Detective Governo, Wayne Turner testified he heard Olguin say to Governo when Turner entered the courtroom, "I have never seen that guy or that's the wrong guy." Wayne Turner immediately told defense counsel what he had heard. However, the trial court struck Wayne Turner's testimony after he refused to answer questions on cross-examination on Fifth Amendment grounds.

Mina Lopez, Turner's mother, testified she heard Olguin tell Detective Governo, "I have never seen him before."

Detective Governo testified that, to her best recollection, Olguin asked, "Is that him?" when Turner entered the courtroom. Olguin never said "that's not the person" or "you have got the wrong guy." Olguin might have said, "I have never seen him before." However, had Olguin made that statement, Governo would have disclosed it to the prosecutor. Governo did not respond to Olguin's statement.

Olguin testified he did not tell Governo, "that is not the guy," when Turner entered the courtroom. Olguin had seen Turner in court previously and he told the prosecutor, prior to his testimony, he could not identify Turner. Olguin testified: "I chose to block [the passenger's face] out. I turned away. I looked directly at him, whoever he was, and turned away." Olguin evaded service of process in this case because he did not want to get involved.

Defense trial counsel, Arlene Binder, testified Wayne Turner told her he heard Olguin tell Detective Governo that Turner was not the shooter and the police had the

---

**4** The prosecutor testified that, after Olguin was arrested on a body attachment and was housed at the county jail, in a recorded telephone conversation with his parents Turner stated, "I'm going to cancel him in here . . . ."

wrong man. By the time Binder received this information, Olguin had completed his testimony and had left the courtroom. Binder recalled looking in the hall for Olguin and not seeing him. She did not go to the elevator to look for him. The same day Olguin testified, Binder asked the prosecutor to contact Olguin. However, Olguin had been staying at a relative's home, was no longer there and the People were unsure of his whereabouts. Binder also had an investigator attempt to locate Olguin. Binder did not cross-examine Olguin because he did not identify Turner. Binder did not move to suppress the identifications based on an unduly suggestive photographic lineup because Renteria had never previously mentioned a mole. Thus, the police did not know a mole would be suggestive. Also, another individual in the lineup has what appears to be acne and Number 6 also has a mole. Further, Binder wanted to argue Renteria had never previously mentioned a mole. Binder saw no basis upon which to object to the live lineup, noting Chavez did not identify Turner at the live lineup.

Detective DiCroce testified Renteria initially said Turner's photograph was similar to the shooter's appearance but, after speaking with DiCroce, she wrote Turner exactly resembled the shooter.

Los Angeles Police Detective Larry Burcher oversees the relocation of witnesses in the Northeast Division. The jury reached a verdict in this case on August 6, 2010. On August 23, 2010, Burcher obtained an ex parte order authorizing relocation assistance for Vilches but no funds were provided to Vilches.

Regarding Olguin, Burcher testified the need to relocate Olguin arose on August 19, 2010, and he was relocated on that date. Olguin was placed in a hotel for 10 days and he received $350 per month toward his rent for two months. He was also provided $1,000 in cash for food and incidentals.

With respect to Velasquez, Burcher obtained an ex parte court order on July 28, 2010, that allowed Velasquez to receive relocation assistance not to exceed $5,000. Velasquez testified on July 30, 2010. No funds were provided to Velasquez before the end of the trial and, as far as Burcher knows, Velasquez was unaware, at the time of his testimony, that relocation assistance had been authorized. Burcher initiated

10

the relocation process for Velasquez because there had been recorded telephone conversations among Turner and his family members in which Velasquez's residence had been discussed. Velasquez, his child, and his child's mother received a total of $4,358.29, consisting of a three-day hotel stay that commenced on August 6, 2010, three months of rent at $820 per month, and three monthly payments of $500.

Velasquez testified at the hearing that when the subject of relocation was first raised, he did not want to move because he lived with his mother near his job. However, Detective DiCroce advised Velasquez to move for his safety and Velasquez asked to be relocated before he testified. After Velasquez testified, with relocation assistance, he moved into a new apartment on August 8 or 9, 2010. Velasquez was threatened at a bus stop by Wayne Turner a week before he knew he had to come to court. On another occasion, two men dressed in Avenues gang attire approached Velasquez's girlfriend outside a medical office, asked if she were Velasquez's girlfriend and followed her to the train station. On another occasion, Turner's mother saw Velasquez in a market and began cursing. Velasquez went outside to wait for his girlfriend. A car carrying a group of young males in Avenues gang apparel arrived, entered the store, spoke to Lopez, came back outside and appeared to be looking for Velasquez.

Binder was recalled and testified she was not advised during trial that Velasquez or Vilches had been offered relocation assistance.

Andrea Pott, the prosecutor, testified the court orders for expenditure of funds to relocate witnesses were prepared in an abundance of caution after Velasquez received threats. Because the State of California did not have a budget in place at the time, relocation assistance required a court order. Although the defense was advised that Renteria and her family were relocated before the first trial, defense counsel did not question Renteria at either trial about the relocation assistance she received. Also, on several occasions Pott advised defense counsel the People's witnesses might have to be relocated because defense counsel had jeopardized their safety by giving Turner's family discovery material.

11

Pott testified Velasquez met with Binder in the courthouse cafeteria before the first trial. According to Velasquez, Binder misrepresented herself as a deputy district attorney and told Velasquez he could ignore subpoenas. Velasquez did not appear for Turner's preliminary hearing or the first trial. After Vilchis unexpectedly identified Turner in court, defense counsel asked for and received additional time to prepare to cross-examine Vilchis. Pott opined inquiry at trial into relocation assistance provided to the prosecution witnesses would have lead to introduction of evidence of the intimidation of witnesses by Turner and his family.

## CONTENTIONS

Turner contends the trial court abused its discretion in admitting Velasquez's statements to Chavez at the hospital, and in failing to grant a new trial on the ground the prosecutor withheld evidence of Olguin's statement to Governo and offers of relocation assistance to prosecution witnesses. Turner also contends defense counsel rendered ineffective assistance in failing to move to suppress identifications by Renteria and Chavez as the product of unduly suggestive pretrial identification procedures, in failing to object to the identification by Vilchis on the ground he failed to identify Turner in a photographic lineup, in failing to recall Olguin after counsel learned Olguin told Governo that Turner was not the shooter and in failing to object to the live lineup.

## DISCUSSION

1. *Velasquez's testimony properly admitted.*

Turner contends the trial court abused its discretion in admitting Velasquez's testimony that Chavez told him, while he was under the influence of morphine and after having undergone surgery, the shooter was the guy they knew as "Snoopy or Snoop Dog" who had a mole on his face. Turner contends Velasquez's testimony was not admissible as a prior identification under Evidence Code section 1238.

However, the testimony was admissible as a prior consistent statement under Evidence Code sections 791 and 1236. Pursuant to these provisions, a prior consistent statement is admissible, notwithstanding the hearsay rule, if it is offered after an inconsistent statement is admitted to attack the testifying witness's credibility, where the consistent statement was made before the inconsistent statement. (Evid. Code, § 791, subd. (a).)

Here, Chavez identified Turner as the shooter at trial. However, the defense impeached the in-court identification by cross-examining Chavez about his failure to identify Turner at the live lineup. Thus, under Evidence Code section 791, subdivision (a), Chavez's prior consistent statement to Velasquez at the hospital, that Turner was the shooter, was admissible to rehabilitate Chavez's in-court identification of Turner. (*People v. Breaux* (1991) 1 Cal.4th 281, 302.)

Also, the trial court could have concluded Chavez's failure to recall making any statements to Velasquez at the hospital was evasion and untruthful. (*People v. Sapp* (2003) 31 Cal.4th 240, 296.) In that case, Chavez's statements to Velasquez were admissible as prior inconsistent statements under Evidence Code sections 770 and 1235.[5] (*People v. Brown* (1995) 35 Cal.App.4th 1585, 1596-1597.) To the extent Chavez was retreating from his in-court identification, the prosecutor was entitled to challenge the claimed failure of memory. (See *People v. Cowan* (2010) 50 Cal.4th 401, 462; *People v. Avila* (2006) 38 Cal.4th 491, 579-580.)

---

[5] Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

In sum, the trial court committed no error or abuse of discretion in permitting the People to introduce evidence of Chavez's statements to Velasquez at the hospital.

2. *The trial court properly denied Turner's motion for new trial*.

a. *Olguin's statement to Governo that Turner was "the wrong guy."*

Turner contends Detective Governo's failure to disclose Olguin's statement that Turner was not the shooter constituted a *Brady* violation. Turner claims timely disclosure of the statement would have permitted defense counsel to recall Olguin to testify Turner was not the shooter and this testimony might have led to acquittal.

Under *Brady*, the People must disclose to the defense all substantial material evidence known to the prosecution that is favorable to the defendant, even in the absence of a request. (*Brady v. Maryland, supra,* 373 U.S. at p. 87.) "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282, fn. omitted [144 L.Ed.2d 286].) Prejudice, in this context, focuses on "the materiality of the evidence to the issue of guilt and innocence." (*United States v. Agurs* (1976) 427 U.S. 97, 112, fn. 20 [49 L.Ed.2d. 342].) Materiality requires a showing of reasonable probability of a different result. (*Kyles v. Whitley* (1995) 514 U.S. 419 [131 L.Ed.2d 490]; *People v. Verdugo* (2010) 50 Cal.4th 263, 279.) "We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence. [Citation.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.).

Here, in denying the motion for new trial, the trial court rejected the testimony of Turner's parents and impliedly found Olguin did not say, "that's not the guy" or "they have the wrong guy." Rather, the trial court apparently accepted the testimony of Olguin and Governo that Olguin did not say Turner was not the shooter but might have asked something like "is that the guy?" We accept the trial court's implicit findings of fact and conclude Turner has failed to establish any of the components of a *Brady* violation.

14

The assertedly withheld evidence was not exculpatory or favorable to the defense in the context of this case. As the trial court noted, Olguin did not identify Turner and testified "he didn't see the faces of the people." Olguin's statement, "is that the guy" or something similar to it when Turner entered the courtroom, was not material in that it was consistent with Olguin's testimony he could not identify Turner as the passenger in the white car. Thus, the failure to disclose the evidence did not create a reasonable probability of a different outcome.

In any event, because defense counsel was made aware of the evidence almost immediately, it was not withheld or suppressed within the meaning of *Brady*. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1049.) Defense counsel testified she learned of the alleged statement after Olguin left the courtroom. Defense counsel immediately looked for Olguin in the hallway and inquired of the prosecutor that day regarding his whereabouts without success. Defense counsel also asked her investigator to try to locate Olguin. The trial court impliedly credited this testimony in denying the motion for new trial. Thus, Turner's claim of a *Brady* violation fails.

b. *The offer of relocation assistance*.

Turner contends the trial court abused its discretion in failing to grant a new trial on the ground the prosecution withheld evidence that Velasquez and Vilchis were offered relocation assistance and cash incentives before they testified. (*Giglio v. United States* (1972) 405 U.S. 150, 153-154 [31 L.Ed.2d 104] [prosecutor must disclose inducements to witnesses].) Turner also argues this issue with respect to Olguin. He claims that, had this information been disclosed, the defense could have argued the testimony of these witnesses was motivated by personal gain.

Regarding Velasquez, two days before he testified, on July 28, 2012, Detective Burcher obtained an ex parte order granting Velasquez relocation funds up to $5,000. After he testified, Velasquez, his child and his child's mother were relocated and received $1,500 in cash. The trial court found Velasquez rejected offers of relocation assistance prior to his testimony and Detective Burcher sought the order "just in case." Because

15

Velasquez was not interested in relocation assistance at the time of his testimony, there was nothing to disclose.

Regarding Vilchis, Burcher did not obtain an ex parte order authorizing assistance until more than two weeks after the verdicts and no funds were provided to Vilchis.

Regarding Olguin, Burcher testified the need to relocate Olguin arose about two weeks after Olguin testified. Olguin was placed in a hotel for 10 days and he received approximately $1,700 toward rent, food and incidentals. It therefore appears there was no relocation assistance to disclose at the time of Olguin's testimony. Further, because Olguin did not identify Turner at trial, disclosure of the offer of relocation assistance to Olguin would not have altered the result of trial.

Finally, even assuming the People should have disclosed the offers of relocation assistance or the ex parte orders authorizing relocation assistance to these witnesses, no prejudice can be shown. Any attempt to impeach these witnesses on the basis they had been offered relocation assistance would have led to the introduction of evidence these witnesses had been threatened by Turner, his parents and Avenues gang members, thereby demonstrating consciousness of guilt. Thus, it is unlikely the defense would have inquired about relocation assistance even had it been disclosed. Indeed, the defense knew Renteria's family was relocated before the first trial but did not inquire of her at either trial. Because it is apparent similar information with respect to these witnesses would not have been presented to the jury, the trial court properly denied the motion for new trial.

3. *General principles related to Turner's remaining claims.*

a. *Ineffective assistance of counsel.*

"In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the

16

manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)

   b. *Unduly suggestive identification procedures.*

  Due process requires the exclusion of identification testimony only if the identification procedure "is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' [Citation.]" (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.) The defendant bears the burden of showing the identification procedure used in any case was suggestive and unreliable. (*People v. Avila* (2009) 46 Cal.4th 680, 700; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

  " 'Because human beings do not look exactly alike, differences are inevitable. The question is whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943; *People v. Cunningham* (2001) 25 Cal.4th 926, 990.)

  If the identification procedure is not unduly suggestive, inquiry into the due process claim ends. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.) If a procedure is found to be unduly suggestive, a witness's identification testimony is only inadmissible if the totality of the circumstances suggests a very substantial likelihood of irreparable misidentification. (*People v. Arias* (1996) 13 Cal.4th 92, 168.) We independently review a claim that an identification procedure is unduly suggestive. (*People v. Gonzalez, supra,* 38 Cal.4th at p. 943.)

  4. *Failure to object to Renteria's identification.*

  Turner contends defense counsel should have objected to Renteria's in-court identification because it was based on an unduly suggestive photographic lineup. Turner claims a mole on his upper lip jumps out at the viewer and makes his photograph stand out from the others in People's Exhibit 40 in a way that suggested Turner should be selected. Also, Turner is the youngest person in the photographic lineup and the only person who appears to be similar in age to the alleged shooter, i.e., 16 to 19 years.

Turner also claims the photographic lineup was suggestive because, in a recorded interview on October 31, 2010, Detective DiCroce asked Renteria if the shooter had a mole, thereby suggesting the shooter might have a mole. Turner claims the taint of the photographic lineup carried over to the live lineup, depicted in Exhibit 32, where he again was the only juvenile and the only individual with a mole.

We have ordered the trial exhibits transmitted from the superior court and have examined Exhibit 40 and conclude the photographic lineup was not unduly suggestive. Contrary to Turner's assertion, all of the males in the lineup appear youthful and of the same approximate age. Turner does not stand out as the youngest individual. Further, all of the photographs depict males with a medium build and closely cropped, dark colored hair, with the same approximate skin tone. Each of the individuals has a similar facial expression and all of the photographs are in color and were taken against a neutral background. Although Turner is depicted with a mole on his upper lip, as stated at the hearing on the motion for new trial, two other individual depicted in the photographic lineup have facial marks, one with acne and the other with a mole. Also, the photograph of Turner is grainy such that the mole on his upper lip is less prominent than it is in other pictures of Turner contained in the record.

Thus, there is no basis for us to conclude Turner's mole caused him to " 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Gonzalez, supra,* 38 Cal.4th at p. 943.) Further, "there is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance. [Citation.]" (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052; *People v. Johnson* (1992) 3 Cal.4th 1183, 1217-1218 [only the defendant wore jail clothing in photographic lineup]; *People v. DeSantis, supra,* 2 Cal.4th at p. 1222 [perpetrator wore a red jacket and only the defendant wore a red shirt in photographic lineup].)

In sum, a motion to suppress Renteria's identification of Turner on the grounds suggested by Turner would not have succeeded. Because the photographic lineup was not unduly suggestive, there was no taint to carry over to the live lineup. As a result,

18

Turner cannot demonstrate ineffective assistance. "[T]rial counsel is not required to make frivolous or futile motions, or indulge in idle acts. [Citations.]" (*People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1409; *People v. Boyette* (2002) 29 Cal.4th 381, 424.)

Further, contrary to Turner's assertion, Detective DiCroce's inquiry of Renteria in the tape recorded interview as to whether the shooter had a mole was not suggestive. There was no evidence DiCroce suspected the shooter had a facial mole at the time of the interview. Also, DiCroce asked the question in passing in the course of an extended interview. Thus, nothing about DiCroce's interrogation of Renteria suggested she should select Turner's photograph or rendered her identification of Turner inadmissible.

Finally, defense counsel testified she decided, as a tactical matter, to exploit the infirmities of Renteria's identification including her identification of "Fatal" at the scene, her failure to mention Turner's facial mole before she was shown the photographic lineup, her improper conduct in photographing the photographic lineup and her admitted reliance on the photographic lineup to select Turner at the live lineup. By proving Renteria's identification was tainted, defense counsel reasonably sought to undermine the reliability of identifications by other eyewitnesses, primarily Chavez.

Defense counsel presented expert testimony to support the defense theory. The eyewitness identification expert testified the most accurate identifications are made in initial descriptions. Also, details are very important and a live lineup is not reliable if "one of the alternatives looks familiar because you have seen him in a prior test . . . ."

Thus, in addition to there being no basis upon which to object to the photographic lineup as unduly suggestive, the record affirmatively discloses a reasonable tactical explanation for the challenged act or omission. Consequently, the claim of ineffective assistance fails. (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926; *People v. Majors* (1998) 18 Cal.4th 385, 403; *People v. Lucas* (1995) 12 Cal.4th 415, 436-437.)

5. *Failure to object to Chavez's identification.*

Turner contends defense counsel should have objected to Chavez's in-court identification as the product of the unduly suggestive live lineup. However, Chavez did not make an identification at the live lineup. Thus, there was no pretrial basis upon which to object to Chavez's identification of Turner,

At trial, Chavez testified he feared gang retaliation but identified Turner as the individual with whom he had a face-to-face confrontation in which they engaged in gang dialogue before Turner started shooting. Additionally, Velasquez's testimony indicated Chavez and Turner knew each other in middle school. Based on this record, any attempt to exclude Chavez's in-court identification of Turner would have failed. The fact Chavez failed to identify Turner in the live lineup went to the weight to be accorded Chavez's in-court identification, not its admissibility.

In any event, we have examined the trial exhibits related to the live lineup (Exhibit 32), and conclude it was not unduly suggestive as the participants are all of the same approximate age and appearance. (*People v. Gonzalez, supra*, 38 Cal.4th at p. 943.) Thus, defense counsel did not render ineffective assistance in failing to seek suppression on the grounds asserted by Turner on appeal. (*People v. Boyette, supra,* 29 Cal.4th at p. 424; *People v. Reynolds*, *supra*, 181 Cal.App.4th at p. 1409.)

Turner argues defense counsel should have explored whether Turner seemed familiar to Chavez because they attended middle school together. However, Velasquez testified outside the presence of the jury that he attended middle school with Turner. Defense counsel could conclude Chavez, Velasquez's brother through legal guardianship, also attended middle school with Turner or knew Turner. It therefore appears defense counsel reasonably avoided inquiry in this area to prevent the jury from learning Chavez, in fact, recognized Turner from middle school, thereby strengthening the identification.

No ineffective assistance of counsel appears.

20

6. *Failure to object to Detective Carrillo's testimony.*

Turner contends defense counsel should have objected to Detective Carrillo's testimony that Chavez told him, after the live lineup, he recognized Turner "from that day" but did not write it on the statement card because Turner did not have a goatee. Turner claims Carrillo's testimony was inadmissible because it did not qualify as a prior identification under Evidence Code section 1238.

However, Chavez's statement to Detective Carrillo properly was admitted as a prior consistent statement. Evidence Code section 791, subdivision (b) makes admissible evidence of a witness's prior consistent statements to rebut "[a]n express or implied charge . . . his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive." The party seeking to introduce a prior consistent statement must show " 'the statement was made *before* the bias, motive for fabrication, or other improper motive is alleged to have arisen.' (Italics added.)" (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1014.)

Generally, a consistent statement made after an improper motive is alleged to have arisen is inadmissible. (*People v. Gentry* (1969) 270 Cal.App.2d 462, 473.) However, when impeachment with a prior inconsistent statement implicitly accuses the witness of developing a motive to fabricate his or her testimony *at the time of trial,* a consistent statement made prior to trial is admissible even if the consistent statement did not precede the inconsistent statement. (*People v. Ainsworth, supra,* 45 Cal.3d at pp. 1014-1015; see *People v. Williams* (2002) 102 Cal.App.4th 995, 1011-1012.) Under these cases, when a witness is implicitly accused of fabricating his or her testimony *at trial,* a prior consistent statement made *before trial* is admissible.

Here, Chavez identified Turner as the shooter on direct examination. The defense cross-examined Chavez with respect to his failure to identify Turner at the live lineup, thereby impeaching his credibility and suggesting the in-court identification was a recent fabrication. Thus, the People were entitled to introduce evidence of Chavez's prior consistent statement identifying Turner under Evidence Code section 791,

21

subdivision (b). Consequently, defense counsel was not ineffective in failing to object to Detective Carrillo's testimony.

In any event, given Chavez's in-court identification of Turner, any error in the admission of Chavez's statements to Detective Carrillo must be seen as harmless. Chavez's identification was strong evidence of guilt. The evidence suggested Chavez attended middle school with Turner, recognized him and exchanged gang statements before Turner fired numerous shots at Chavez and Betancor. Even had Detective Carrillo's testimony been excluded, no different result would have obtained.

7. *Failure to recall Olguin.*

Turner contends defense counsel rendered ineffective assistance in failing to ask the trial court to order Olguin returned to the courtroom before the electronic tracking bracelet was removed so Olguin could be recalled to the witness stand or interviewed. Turner further complains defense counsel should have inquired of Governo or asked the prosecutor to have Governo write a report about the incident. Turner concludes defense counsel's omissions deprived him of a meritorious defense, in that, by the time of the hearing on the motion for new trial, neither Governo nor Olguin could recall exactly what Olguin had said.

This contention fails. Based on the evidence presented at the hearing, it appears defense counsel learned of the statement after Olguin left the witness stand. Defense counsel thereafter acted reasonably in looking for Olguin in the hallway and asking the prosecutor for assistance in locating Olguin. To the extent Turner suggests other or additional actions defense counsel might have undertaken, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) Under these circumstances, counsel cannot be said to have performed deficiently.

22

In any event, as has been noted, even had Olguin been recalled, Olguin testified at the hearing he never made the statement, he had seen Turner in court previously and he would not recognize the passenger if he saw him again. We have no reason to believe he would have testified differently had he been recalled, especially given that he previously had seen Turner in court. Admission of this evidence would have had no effect on the outcome of the trial.

8. *Failure to object to Vilchis's identification testimony.*

Vilchis was shown a photographic lineup before trial which contained the same picture of Turner as was used in Exhibit 40. Vilchis said another individual in the photographic lineup looked most like the shooter. At a side bar conference during trial, the prosecutor indicated Vilchis was now able to identify Turner. Thereafter, Vilchis testified he "kind of" recognized Turner as the shooter, but Turner's hair was now shorter. Vilchis indicated Turner's face "came back" when Vilchis entered the courtroom.

Turner contends defense counsel should have objected to this testimony as the product of an unduly suggestive photographic lineup. Turner claims that, because he was the only individual with a mole in the lineup, it caused him to stand out. He also claims Vilchis' in-court identification was suggestive because he was the only juvenile with a mole seated at counsel table.

These claims are meritless. Vilchis did not select Turner's photograph in the photographic lineup. Thus, Turner cannot be heard to complain it was unduly suggestive. Further, the photographic lineup shown to Vilchis, Defense Exhibit A, is similar to the photographic lineup shown to Renteria, People's Exhibit 40, and neither is unduly suggestive. Consequently, there was no basis upon which to object to the in-court identification. The failure to identify Turner at the photographic lineup, as well as the fact Turner was the only juvenile in the courtroom with a mole on his face, went to the weight to be accorded Vilchis' in-court identification, not its admissibility. No ineffective assistance of counsel appears.

23

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

KITCHING, J.